No. 99,818

AMY C. MILLER, *Appellant/Cross-appellee*, v. CAROLYN N. JOHNSON, M.D., *Appellee/Cross-appellant*.

(289 P.3d 1098)

638

Opinion filed October 5, 2012.

*William J. Skepnek*, of Skepnek Fagan Meyer & Davis, of Lawrence, argued the cause in the original argument and on reargument; *Ned I. Miltenberg*, of Center for Constitutional Litigation, P.C., of Washington, D.C., argued the cause in the original argument, and *Trey T. Meyer*, of Skepnek Fagan Meyer & Davis, of Lawrence, was with them on the briefs for appellant/cross-appellee. *Lynn R. Johnson*, of Shamberg, Johnson & Bergman, of Kansas City, Missouri, and *Robert S. Peck*, of Center for Constitutional Litigation, P.C., of Washington, D.C., argued the cause on reargument for appellant/cross-appellee.

*Bruce Keplinger*, of Norris & Keplinger, of Overland Park, argued the cause in the original argument and on reargument, and *John Hicks*, of the same firm, was with him on the brief for appellee/cross-appellant. *Steven C. Day*, of Woodard,

Hernandez, Roth & Day, L.L.C., of Wichita, argued the cause on reargument for appellee/cross-appellant.

*Cathy J. Dean, Douglas J. Kramer,* and *Lauren E. Tucker McCubbin,* of Polsinelli Shughart PC, of Kansas City, Missouri, were on the brief for *amicus curiae* Kansas Medical Society and Kansas Hospital Association.

*Timothy J. Finnerty* and *Ryan D. Weltz,* of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Wichita, were on the brief for *amicus curiae* Kansas Association of Defense Counsel.

*Toby Crouse, Scott C. Nehrbass,* and *James D. Oliver,* of Foulston Siefkin, LLP, of Overland Park, were on the brief for *amicus curiae* Kansas Chamber of Commerce.

*James R. Howell* and *Derek Casey,* of Prochaska, Giroux & Howell, of Wichita, and *Lynn R. Johnson,* and *David Morantz,* of Shamberg, Johnson & Bergman, of Kansas City, Missouri, were on the brief for *amicus curiae* Kansas Association for Justice.

*William Rich* and *James M. Concannon,* of Topeka, were on the *amici curiae* brief pro se.

*Molly Wood,* of Stevens & Brand, LLP, of Lawrence, was on the brief for *amici curiae* AARP; El Centro, Inc.; Kansas AFL-CIO, Kansas Advocates for Better Care, Inc.; The Disability Rights Center of Kansas; Kansas Coalition Against Sexual and Domestic Violence; and Linda Henry Elrod, Director of Children and Family Law Center of the Washburn University School of Law.

*Steven C. Day,* of Woodard, Hernandez, Roth & Day, LLC, of Wichita, was on the brief for *amicus curiae* Estephan N. Zayat, M.D.

The opinion of the court was delivered by

BILES, J.: Amy C. Miller sued her doctor, who mistakenly removed her left ovary during a laparoscopic surgery intended to take the right ovary, and a jury awarded her $759,679.74 in damages. But the district court reduced that amount by $425,000 because of a state law limiting noneconomic damages in personal injury lawsuits and a posttrial ruling finding her evidence of future medical expenses insufficient. Both sides appeal, with each claiming the district court erred at various points in the proceedings.

Our initial focus is the constitutionality of K.S.A. 60-19a02, which operated to cap Miller's jury award for noneconomic damages. This statute is one of several enacted to "reform" our state's tort laws, and it has been a subject this court has visited—and revisited—in prior cases with conflicting outcomes. It represents a

long-standing and highly polarizing question nationwide. See, *e.g.*, *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 338, 789 P.2d 541 (1990) (*Samsel II*) (referring to "the stormy controversy which currently surrounds the liability insurance and tort systems"); see also *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 354-55, 757 P.2d 251 (1988) (McFarland, J., dissenting) ("Many physicians truly believe that the legal profession is out to destroy them for personal gain. Many lawyers believe, with equal sincerity, that the medical profession is attempting, through legislation, to avoid its responsibility for harm done by its members. Companies providing medical malpractice insurance are attacked by both groups."). The continuation of this controversy no doubt contributed to the larger-than-usual volume of briefs received in this appeal from the parties and their allied interests.

In resolving the four constitutional issues in this case, a majority of the court upholds K.S.A. 60-19a02 as applied to Miller—a medical malpractice victim. A minority would hold the statute unconstitutional.

As to the trial errors alleged, we unanimously reverse the district court's decision to strike the jury's award for Miller's future medical expenses and remand the case with instructions to reinstate that award. As for the doctor's cross-appeal, it is argued the trial court erred by denying a motion for judgment as a matter of law and motion for new trial. We unanimously deny the doctor's trial error claims.

### FACTUAL AND PROCEDURAL BACKGROUND

The essential facts are straightforward. Miller began seeing Dr. Carolyn N. Johnson in 1994 with a history of painful and irregular menstrual periods. In 2002, after continued suffering from severe pain in her right lower quadrant, Miller, who was 28 years old at the time, consented to having her right ovary removed. Johnson performed a laparoscopic procedure for that purpose. The surgical report, signed by Johnson, stated that the right ovary had been removed. Miller, however, continued to experience severe pain.

Three months after the surgery, Miller discovered during an examination with another doctor that Johnson had mistakenly re-

moved her left ovary instead of the right. A different physician attempted to manage Miller's continuing pain with nonsurgical options, but the pain persisted and Miller decided to have another surgeon remove her remaining ovary. She sued Johnson for medical malpractice in 2004, alleging the doctor violated the appropriate standard of medical care. Johnson vigorously contested the lawsuit, claiming Miller's preexisting medical conditions would have required eventual removal of both ovaries and her uterus, even if the left ovary was taken first in error.

The case went to trial and a jury found the doctor completely at fault. It awarded Miller $759,679.74 in total monetary damages, comprised as follows: (1) $84,679.74 for medical expenses to date; (2) $100,000 for future medical expenses; (3) $250,000 for noneconomic loss to date; (4) $150,000 for future noneconomic loss; and (5) $175,000 noneconomic loss for impairment of services as a spouse. But the district court reduced the jury's award in two postverdict decisions.

In its first ruling, the district court enforced the statutory limitation on noneconomic damages required by K.S.A. 60-19a02. This cut the jury's total award of $575,000 in noneconomic damages by $325,000 to conform to the $250,000 statutory cap. In so ruling, the district court rejected Miller's efforts to avoid the statute's restrictions by challenging its constitutionality. Miller argued the cap violated her right to trial by jury, the right to remedy by due course of law, equal protection, and the doctrine of separation of powers. The primary basis for the district court's ruling was the 1990 decision in *Samsel II*, which was this court's most recent decision on the issue and which the lower court was bound to follow. In addition, the district court denied Miller's request for an evidentiary hearing to attack the legislature's basis for enacting the cap. Instead, Miller filed a written motion proffering the testimony she would have submitted. Highly summarized, Miller's experts would have testified there was no empirical evidence to support a claimed medical malpractice crisis to justify the legislation, that the noneconomic damages cap has a disparate impact on women and the elderly, and that there is little support for believing that juries award damages for frivolous claims out of sympathy for a plaintiff.

In its second ruling, the district court struck the $100,000 jury award for future medical expenses. The court held that Miller offered insufficient evidence for the jury to make findings about her future medical or counseling needs, how much future care she would require, or what that cost would be over the next several decades until she reached menopause.

Combining the reductions resulting from these two determinations, the district court entered a final monetary judgment against Johnson for $334,679.74.

In rulings made against the doctor that are also the subject of this appeal, the district court denied Johnson's motion for judgment as a matter of law, which was premised on a defense claim that Miller failed to prove causation due to her preexisting medical conditions. The district court held there was sufficient evidence to support the jury's finding on causation. It further found there was no medical indication to remove the left ovary at the time Johnson performed the laparoscopic procedure and that the evidence was sufficient to show Miller experienced a variety of problems as a result of her having both ovaries removed. The district court acknowledged that Johnson presented conflicting evidence but held those inconsistencies were best resolved by the jury, which found against the doctor.

Regarding the motion for new trial, the district court rejected the doctor's argument that it had improperly prevented Miller's treating physicians from testifying that it would have been necessary to eventually remove both ovaries. Johnson claimed this evidence supported the defense theory and would have been significant to jury deliberations. But the district court disagreed and held the treating physicians' testimony was properly limited to those matters stated in their medical records, their care and treatment of Miller, and inquiries reasonably related to that treatment.

Both sides appeal the rulings adverse to their respective interests. This court transferred the case from the Court of Appeals. See K.S.A. 20-3018(c) (transfer of cases on court's motion). Thereafter, we conducted oral arguments on two separate dockets. This unusual occurrence was necessitated by changes to the court's

composition after the original oral arguments. Reargument was held February 18, 2011.

We address first the four constitutional attacks leveled against K.S.A. 60-19a02 by Miller, and then we will discuss the trial error claims. But before doing so, the court acknowledges the contributions to our analysis made by the parties and *amici curiae*. Their deeply rooted concerns about these important constitutional questions are evident, even though they disagree in the rationale that might drive the outcomes.

## THE STATUTE'S CONSTITUTIONALITY

K.S.A. 60-19a02 was enacted in 1988. L. 1988, ch. 216, sec. 3. It limits the total amount recoverable to $250,000 for noneconomic loss in any personal injury action, including medical malpractice claims. "Noneconomic losses include claims for pain and suffering, mental anguish, injury and disfigurement not affecting earning capacity, and losses which cannot be easily expressed in dollars and cents." *Samsel II*, 246 Kan. 336, Syl. ¶ 6. The statute provides:

"(a) As used in this section 'personal injury action' means any action seeking damages for personal injury or death.

"(b) *In any personal injury action, the total amount recoverable by each party from all defendants for all claims for noneconomic loss shall not exceed a sum total of $250,000.*

"(c) In every personal injury action, the verdict shall be itemized by the trier of fact to reflect the amount awarded for noneconomic loss.

"(d) If a personal injury action is tried to a jury, the court shall not instruct the jury on the limitations of this section. *If the verdict results in an award for noneconomic loss which exceeds the limit of this section, the court shall enter judgment for $250,000 for all the party's claims for noneconomic loss.* Such entry of judgment by the court shall occur after consideration of comparative negligence principles in K.S.A. 60-258a and amendments thereto.

"(e) The provisions of this section shall not be construed to repeal or modify the limitation provided by K.S.A. 60-1903 and amendments thereto in wrongful death actions.

"(f) The provisions of this section shall apply only to personal injury actions which are based on causes of action accruing on or after July 1, 1988." (Emphasis added.) K.S.A. 60-19a02.

This was not the first restraint on noneconomic damages imposed by the legislature in common-law tort cases in Kansas. The

first was enacted in 1986 and applied exclusively to medical malpractice lawsuits. K.S.A. 1986 Supp. 60-3407. It restricted noneconomic damages to $250,000 but also imposed an overall cap of $1 million for total damages. K.S.A. 1986 Supp. 60-3407(a). It further provided for annual adjustments to the noneconomic damages cap based on the consumer price index. K.S.A. 1986 Supp. 60-3407(d). This 1986 statute was enacted in response to continued efforts from health care professionals and the insurance industry to improve insurance rates for medical malpractice coverage and make insurance more readily available. K.S.A. 1987 Supp. 60-3405. In 1988, a majority of this court declared the 1986 cap on noneconomic damages unconstitutional. *Kansas Malpractice Victims*, 243 Kan. at 346, 352 (statute violated both the Section 5 right to jury trial and Section 18 remedy provision of the Kansas Constitution Bill of Rights).

But even before the *Kansas Malpractice Victims* decision was announced, the 1987 legislature enacted a $250,000 noneconomic damages cap limiting recovery for pain and suffering in all other personal injury actions. L. 1987, ch. 217, sec. 1. That statute did not apply to medical malpractice actions and did not include a cost-of-living adjustment. K.S.A. 1987 Supp. 60-19a01. The following year, the legislature merged these two damages caps into the statute at issue in this case. L. 1988, ch. 216, sec. 3. The cost-of-living adjustment in the earlier medical malpractice cap was removed. *Cf.* K.S.A. 60-19a02; K.S.A. 1986 Supp. 60-3407(d). K.S.A. 60-19a02 now places a $250,000 limitation on noneconomic damages in all personal injury actions, including medical malpractice claims, accruing on or after July 1, 1988. K.S.A. 60-19a02(f).

In 1990, a majority of this court upheld the 1988 statute's constitutionality. *Samsel II*, 246 Kan. at 338. Since then, this court has considered other "tort reform" statutes, as they are commonly characterized, upholding some and declaring others unconstitutional. See *Bair v. Peck*, 248 Kan. 824, 845, 811 P.2d 1176 (1991) (K.S.A. 40-3403[h] does not violate the right to jury trial, right to remedy, or equal protection by eliminating vicarious liability of health care providers in certain circumstances); *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1022-23, 850 P.2d 773 (1993) (K.S.A. 60-

3802 violated equal protection by allowing evidence of collateral source benefits in personal injury cases when plaintiff sought more than $150,000 in damages); *Smith v. Printup*, 254 Kan. 315, 332-33, 866 P.2d 985 (1993) (K.S.A. 60-3701 *et seq.*, does not violate right to jury trial by requiring courts to decide punitive damages); *Aves v. Shah*, 258 Kan. 506, 524, 527, 906 P.2d 642 (1995) (K.S.A. 40-3403[e] and K.S.A. 40-3412[c] do not violate Section 18 due process or equal protection by prohibiting bad faith actions against the Health Care Stabilization Fund); *Bonin v. Vannaman*, 261 Kan. 199, 217-19, 929 P.2d 754 (1996) (K.S.A. 60-515[a] does not violate Section 18 right to remedy or equal protection by setting an 8-year statute of repose for minors or persons with legal disability); *Lemuz v. Fieser*, 261 Kan. 936, 960, 933 P.2d 134 (1997) (K.S.A. 65-442[b] does not violate Section 18 right to remedy by abrogating corporate negligence claims against any medical care facility for allowing a physician, who is not an agent or employee, to work on its staff).

Miller argues the statutory cap violates: (1) the right to jury trial under Section 5 of the Kansas Constitution Bill of Rights; (2) the right to remedy by due course of law under Section 18 of the Kansas Constitution Bill of Rights; (3) the equal protection provision of Section 1 of the Kansas Constitution Bill of Rights; and (4) the doctrine of separation of powers. Miller urges us to revive the reasoning in *Kansas Malpractice Victims*, which struck down the 1986 cap and found that statute unconstitutional. Johnson counters that our 1990 *Samsel II* decision, which more recently upheld the current statute's constitutionality, is the binding precedent that should resolve future court rulings on this subject. The *amici* take various positions in concert with their respective interests, which we address when necessary.

*Standard of Review for Challenges to a Statute's Constitutionality*

"Courts are only concerned with the legislative power to enact statutes, not with the wisdom behind those enactments." *Samsel II*, 246 Kan. at 348. Our standard of review is well known. When a statute's constitutionality is attacked, the statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe that statute as consti-

tutionally valid, this court has the authority and duty to do so. *Rural Water District No. 2 v. City of Louisburg*, 288 Kan. 811, 817, 207 P.3d 1055 (2009) (citing *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 629-30, 176 P.3d 938 [2008]). Appellate courts conduct unlimited review of questions regarding a statute's constitutionality because they are issues of law. *Brennan v. Kansas Insurance Guaranty Ass'n*, 293 Kan. 446, 450, 264 P.3d 102 (2011).

*Section 5 Analysis—the Right of Trial by Jury*

Section 5 of the Kansas Constitution's Bill of Rights protects the right to trial by jury. It states: "The right of trial by jury shall be inviolate." This right is "a basic and fundamental feature of American jurisprudence." *Gard v. Sherwood Construction Co.*, 194 Kan. 541, 549, 400 P.2d 995 (1965). "It is a substantial and valuable right and should never be lightly denied. The law favors trial by jury, and the right should be carefully guarded against infringements." 194 Kan. at 549.

Our court has consistently held that Section 5 preserves the jury trial right as it historically existed at common law when our state's constitution came into existence. *State ex rel. v. City of Topeka*, 36 Kan. 76, 85-86, 12 P. 310 (1886) (Section 5 means "the right of trial by jury shall be and remain as ample and complete as it was at the time when the constitution was adopted."); *Kimball and Others v. Connor, Starks and Others*, 3 Kan. 414, 432 (1866). And the parties correctly do not dispute that common-law tort actions, including medical malpractice claims, were historically triable to a jury. See, *e.g.*, *Kansas Malpractice Victims*, 243 Kan. at 342-43. There is also correctly no dispute that the amount of damages, including noneconomic damages, was a question of fact determined by the jury in common-law tort actions. See *Samsel II*, 246 Kan. at 350-52, 358.

Miller argues the cap unconstitutionally supplants the jury's role in assessing damages according to the evidence adduced at trial with an arbitrary number picked by legislators. Johnson disagrees, claiming the jury's function is unimpeded by the statute because the jury is not told to award damages up to $250,000. Instead, it is instructed to determine the amount of money that will "fairly and

adequately compensate" the plaintiff. See PIK Civ. 4th 171.02. Johnson further contends the statutory cap simply operates to prevent the district court from entering a judgment against a defendant that is more than $250,000 for noneconomic damages. Johnson argues this postverdict exercise does not infringe on the jury's actual function, so the right to jury trial is not implicated by the statute and there is no constitutional issue presented under Section 5. See also Justice McFarland's concurrence in *Samsel II*, 246 Kan. at 363 (right to jury trial does not extend to remedy phase of trial).

But we need not engage these contentions for long because our caselaw already makes clear that Miller's personal injury claims against her doctor are subject to Section 5 protections. See *Samsel II*, 246 Kan. at 358 (damages are a jury issue under Section 5); *Kansas Malpractice Victims*, 243 Kan. at 342-43 (actions for recovery of damages for negligent injury were triable to a jury under the common law, so Section 5 guarantees the right to a trial by jury in medical malpractice actions); *Gard*, 194 Kan. at 549 (parties entitled to jury trial as a matter of right in common law action for damages based on negligence claim). And given the jury's historic role in determining noneconomic damages based on the facts of each case, we follow our existing caselaw and hold that K.S.A. 60-19a02 encroaches upon the rights preserved by Section 5. This encroachment, however, does not necessarily render K.S.A. 60-19a02 unconstitutional under Section 5.

Our court has long recognized that the legislature may modify the common law in limited circumstances without violating Section 5. See *Samsel II*, 246 Kan. at 358; *Kansas Malpractice Victims*, 243 Kan. at 344; *Manzanares v. Bell*, 214 Kan. 589, 616, 522 P.2d 1291 (1974); *Shade v. Cement Co.*, 93 Kan. 257, 260, 144 Pac. 249 (1914). And neither party challenges the legislature's authority to modify the common law without violating Section 5—an argument that would have been contrary to our prior caselaw. Instead, Miller and Johnson dispute the extent of the limitations that exist on this legislative power.

We begin our analysis by examining how this court has previously addressed the limitations on the legislative power to modify common-law rights under Section 5 by tying that determination to the

substitute remedy analysis used in Section 18 right-to-remedy cases—commonly referred to as a "quid pro quo" (this for that). Our caselaw derives from decisions upholding the state's workers compensation system and no-fault automobile insurance, as well as conflicting decisions dealing with health care provider insurance availability and general tort litigation. We consider this next.

In *Shade*, the first decision addressing Section 5, this court considered a constitutional challenge to the state's original workers compensation system, which was enacted early in the 20th century. This statutory scheme represented a significant public policy shift in how injured workers could recover for on-the-job injuries because it abolished a worker's common-law right to sue an employer or fellow employee and denied the worker the right to have a jury determine damages. See *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 852, 942 P.2d 591 (1997) ("In 1911, the legislature abolished a plaintiff's right to sue an employer for damages caused by the negligence of the employer. In place of this right, the legislature gave employees the Workers Compensation Act."). The *Shade* court expressly held that Section 5 was not an impediment to the legislature's authority to enact the workers compensation system. *Shade*, 93 Kan. at 260 ("The objection based upon the supposed deprivation of a right of trial by jury is equally untenable, as determined in many adjudicated cases.").

But the *Shade* court's holding did not articulate the analytical basis for its decision on the Section 5 challenge. This has led some post-*Shade* decisions and the dissenters in this case to interpret *Shade* as upholding the legislation solely upon an opt-out provision that permitted employees and employers to elect *out* of the system prior to a claim occurring. See *Kansas Malpractice Victims*, 243 Kan. at 344 (commenting that *Shade* "upheld the validity of worker's compensation legislation because coverage under the act was elective"). This view, however, can be criticized as an oversimplification of the statute. The opt-out provision in the original workers compensation law was entirely passive in nature, and its effect was not based on a knowing and voluntary waiver or affirmative consent. Instead, the law upheld in *Shade* abolished an injured worker's "inviolate" right to a jury trial as stated in Section 5 even

though the worker had done nothing to accept the benefits under the statute or forego his or her constitutional right to a jury trial. The statute simply took away this inviolate right unless the worker performed an intentional act to preserve it by opting out of the statutory provisions. Thus, the *Shade* decision's influence on any Section 5 analysis cannot be as easily discarded as the dissent argues.

Regardless, the opt-out provision was removed in 1974, making the system mandatory for both employees and employers. L. 1974, ch. 204, sec. 8 (amending K.S.A. 44-505). And our more recent decisions emphasize that the Workers Compensation Act constitutionally balances the interests of employees and employers—a balance described as an adequate quid pro quo. See, *e.g.*, *Injured Workers of Kansas*, 262 Kan. at 852 ("In place of [an employee's right to sue the employer], the legislature gave employees the Workers Compensation Act, which is supposed to provide a quick, set amount of money, without proof of employer negligence, for all employees injured on the job."); *Rajala v. Doresky*, 233 Kan. 440, 441, 661 P.2d 1251 (1983) ("The Workmen's Compensation Act removes certain common law remedies for injured employees but provides a statutory substitute therefor. This is basically a matter of public policy . . . ."). Most recently in *Scott v. Hughes*, 294 Kan. 403, 275 P.3d 890 (2012), this court noted the act's quid pro quo by explaining:

"The Kansas Workers Compensation Act nullifies employee common-law rights to sue in tort in exchange for guaranteed but limited recovery in an administrative system with judicial review. Covered workers no longer may exercise their common-law rights to sue employers for work-related injuries, but they can count on certain, limited compensation. The Act also makes a trade for covered employers: They need no longer fear unlimited liability on employee claims, but they must purchase insurance or otherwise provide for guaranteed payment of the compensation amounts dictated." 294 Kan. at 413.

Similar reasoning in Section 5 challenges has been applied to other comprehensive legislation impacting a litigant's common-law rights. In *Manzanares*, this court considered the statutory scheme commonly known at the time as the Kansas No-Fault Insurance Act. Among other provisions, the Act denied a Section 5 right-to-

jury trial and recovery for pain and suffering resulting from a motor vehicle accident unless the injured party incurred more than $500 in medical services or suffered a statutorily designated injury. In deciding there was no Section 5 violation, the *Manzanares* court followed *Shade* by recognizing the legislature's limited power to modify the common law without infringing on the right to jury trial. 214 Kan. at 599 ("The decisions of this court are replete with instances of common-law rights being modified or abolished."). As the *Manzanares* court put it, "We have previously held the Legislature has the power to modify the common law. Section 5 of our Bill of Rights does not bar those changes." 214 Kan. at 616.

*Manzanares* also held that modifications of common-law rights were acceptable so long as the due process requirements of Section 18 were satisfied. 214 Kan. at 599; *Kansas Malpractice Victims*, 243 Kan. at 343-44 (explaining *Manzanares*). And it is noteworthy that no member of the *Manzanares* court dissented from its Section 5 holding, even though three justices wrote separately to concur with or dissent from other portions of the decision.

Fourteen years after *Manzanares*, this court determined that the Section 5 right to jury trial was violated in *Kansas Malpractice Victims*. In that decision, the majority declared unconstitutional K.S.A. 1986 Supp. 60-3407, which limited noneconomic damages in medical malpractice actions to $250,000 and total damages to $1 million and required an annuity for payment of future noneconomic loss. *Kansas Malpractice Victims*, 243 Kan. 333, Syl. In arriving at this outcome, the analytical model the court used applied the prior quid pro quo caselaw that developed in the areas of workers compensation and no-fault automobile insurance. Relying on *Manzanares*, the majority acknowledged again that the legislature had the limited power to modify the right to jury trial within the confines of due process, stating:

"[T]he legislature can modify the right to a jury trial through its power to change the common law. [Citation omitted.] This power, however, is not absolute. Under *Manzanares*, any statutory modification of the common law must meet due process requirements and be 'reasonably necessary in the public interest to promote the general welfare of the people of the state.' [Citation omitted.] Due process requires that the legislative means selected have a real and substantial relation to

the objective sought. [Citation omitted.] *One way to meet due process requirements is through substitute remedies. 'We have never held one to have a vested right in the common-law rules governing negligence actions so as to preclude substituting a viable statutory remedy.' Manzanares v. Bell*, 214 Kan. at 599." (Emphasis added.) *Kansas Malpractice Victims*, 243 Kan. at 343-44.

The court agreed that due process constraints were satisfied when the legislature provides an adequate substitute remedy, or "quid pro quo," when modifying common-law rights. And for this holding, the *Kansas Malpractice Victims* court referred its analysis back to *Rajala*, noting that although the workers compensation system removed certain common-law remedies for injured workers, it also provided a statutory substitute for those changes. 234 Kan. at 344 ("The *Rajala* court upheld the [workers compensation] legislation because the legislature provided, as a substitute, a viable statutory remedy."). The *Kansas Malpractice Victims* majority stated:

"Just as the rights secured by Section 5 are not absolute, neither are the rights secured by Section 18 [remedy by due course of law]. Over the years, the court has allowed the legislature to modify remedies when required by public policy. [Citation omitted.] *However, as with Section 5, the court looks to insure that due process requirements are met and, when a common-law remedy is modified or abolished, an adequate substitute remedy must be provided to replace it."* (Emphasis added.) 243 Kan. at 346-47.

In other words, *Kansas Malpractice Victims*, which was the first case by this court to consider a Section 5 challenge to a statutory cap on jury-assessed damages, applied a quid pro quo analysis as it found had been done explicitly in *Rajala* and *Manzanares*, and implicitly in *Shade*. But the difference was that the majority in *Kansas Malpractice Victims* determined that the legislature's substitution of remedies was inadequate—on balance—after applying the quid pro quo analytical model. This outcome, however, was short-lived.

In *Samsel II*, this court revisited the adequate substitute remedy issue when addressing the current statutory cap on noneconomic damages, which was applicable to all personal injury plaintiffs, including medical malpractice. The *Samsel II* court concluded that K.S.A. 1988 Supp. 60-19a01 did not violate a personal injury plain-

tiff's right to jury trial under Section 5 or the right to remedy under Section 18. The majority followed the process set out in *Kansas Malpractice Victims* to decide the adequacy of the substituted rights, specifically: (1) the modification must be reasonably necessary in the public welfare, and (2) "the legislature [must] substitute the viable statutory remedy of quid pro quo (this for that) to replace the loss of the right." *Samsel II*, 246 Kan. at 358, 361.

The difference in outcomes from *Kansas Malpractice Victims* is that *Samsel II* held that tort victims *did* receive an adequate substitute benefit in exchange for the legislative cap because the statute restricted a trial court's common-law power of remittitur to reduce a noneconomic damages award in excess of $250,000. *Samsel II* reasoned that *Kansas Malpractice Victims* had "left unanswered" the question of whether this limitation on the trial court's power to reduce an award below $250,000 provided a sufficient quid pro quo but concluded the two decisions were consistent in their approaches to the legal question presented. 246 Kan. at 358-59.

Moving now to Miller's right to jury trial argument, we face two questions in light of our Section 5 caselaw. First, should this court continue to use a quid pro quo analysis to determine whether the legislature properly exercised its power to modify a common-law jury trial right? If the answer to that question is yes, then we consider a second question: Has the legislature provided an adequate substitute for the jury trial right obstructed by the noneconomic damages cap? On the first question, the majority of this court holds the quid pro quo analysis should continue to apply to a Section 5 claim of encroachment on the right to jury trial to remain consistent with our caselaw. We explain that holding next.

The doctrine of stare decisis maintains that once a point of law has been established by a court, it will generally be followed by the same court and all courts of lower rank in subsequent cases when the same legal issue is raised. A court of last resort will follow that rule of law unless clearly convinced it was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent. *Rhoten v. Dickson*, 290 Kan. 92, 112, 223 P.3d 786 (2010). Stare decisis

" ' "promote[s] system-wide stability and continuity by ensuring the survival of decisions that have been previously approved by a court." ' " *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 715, 89 P.3d 573 (2004) (quoting *Samsel II*, 246 Kan. at 356). "Judicial adherence to constitutional precedent ensures that all branches of government, including the judicial branch, are bound by law." *Samsel II*, 246 Kan. at 356.

A quid pro quo analysis in Section 5 challenges to the legislature's limitations on recovery for personal injuries has been employed by this court in varied contexts, including workers compensation (*Rajala*), no-fault automobile insurance coverage (*Manzanares*), medical malpractice (*Kansas Medical Malpractice Victims*), and general tort litigation (*Samsel II*). To retreat from that analysis now, our court would have to overrule those cases and embark on a new analytical model that would collaterally create uncertainty about the constitutionality of the Workers Compensation Act, which has been upheld since our 1914 decision in *Shade*, and what is now known as the Kansas Automobile Injury Reparations Act, upheld since our 1974 decision in *Manzanares*. See *Samsel II*, 246 Kan. at 361.

In addition, there is a link between Section 5 and Section 18 issues in a damages case such as this, so it seems logical when dealing with statutory caps to have Section 5 and Section 18 encroachments measured against the same standard as has been done in our prior caselaw. As discussed in greater detail below, our caselaw dealing with Section 18 right-to-remedy issues is well entrenched using a quid pro quo analysis and it simply makes sense to have the same analytical model for Section 5. After all, noneconomic damages are a subset of compensatory damages; therefore, the statutory cap impacts a plaintiff's compensatory damages, which is a category of remedy at common law protected by Section 18. *Smith v. Printup*, 254 Kan. 315, 325, 866 P.2d 985 (1993). Moreover, the quid pro quo model readily allows the legislature to understand that it must provide an adequate and viable substitute when modifying a common-law jury trial right under Section 5 or right to remedy under Section 18.

Accordingly, we are not clearly convinced use of the quid pro quo model was originally erroneous or is no longer sound because

of changing conditions, or that more good than harm would come by departing from this precedent. See *Rhoten*, 290 Kan. at 112. And while our court has come to different outcomes after employing the quid pro quo analysis in Section 5 challenges, this does not detract from its viability as an analytical model to determine such challenges. See *Bair v. Peck*, 248 Kan. 824, 844, 811 P.2d 1176 (1991) (Adequacy of the substitute remedy as it applies to comprehensive remedial legislation must be made on a case-by-case basis.); *Lemuz v. Fieser*, 261 Kan. 936, Syl. ¶ 6, 933 P.2d 134 (1997) (In considering the adequacy of the quid pro quo of comprehensive legislation that substitutes a statutory remedy for one that formerly existed at common law, "no hard and fast rule can apply to all cases.").

We hold that a quid pro quo analysis is appropriate for determining Miller's Section 5 right-to-jury trial claims against K.S.A. 60-19a02. We will employ that analysis below after discussing the Section 18 challenge next.

*Section 18 Analysis—the Right to Remedy*

Section 18 of the Kansas Constitution Bill of Rights guarantees the right to a remedy. It states: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." This right has been found since our early caselaw to mean "reparation for injury, ordered by a tribunal having jurisdiction, in due course of procedure and after a fair hearing." *Hanson v. Krehbiel*, 68 Kan. 670, Syl. ¶ 2, 75 Pac. 1041 (1904).

As with Section 5, there is no dispute that Section 18 guarantees are implicated when the legislature imposes statutory caps on noneconomic damages for personal injury plaintiffs, such as medical malpractice victims like Miller. Section 18 provides "an injured party . . . a constitutional right to be made whole and a right to damages for economic and noneconomic losses suffered." *Samsel II*, 246 Kan. at 353. The purpose of economic and noneconomic damages is to make the injured party whole by restoring the person to the position he or she was in prior to the injury. See *Samsel II*, 246 Kan. at 352-53; *Kansas Medical Malpractice Victims*, 243 Kan.

at 350 (right to a remedy is infringed by statute limiting recovery for noneconomic loss, overall loss, and forcing plaintiffs to accept their award over a number of years through an annuity contract); *Neely v. St. Francis Hospital & School of Nursing*, 192 Kan. 716, 720-21, 391 P.2d 155 (1964) (Section 18 applied to recovery for personal injuries suffered from negligent administration of a vaccination).

The issue here is whether the statutory cap on noneconomic damages violates Section 18 by denying Miller a remedy by due course of law because she cannot recover more than $250,000 for her noneconomic damages. We have previously employed in Section 18 challenges the same quid pro quo analysis as discussed above regarding Section 5 to determine whether the legislature provided an adequate substitute remedy for the common-law right affected. See, *e.g.*, *Manzanares*, 214 Kan. at 599. In *Manzanares*, this court upheld the mandatory no-fault automobile insurance laws against a Section 18 attack, stating:

"While Section 18 of the Bill Rights provides a broad field for the protection of persons, property and reputation, the vested rights contained therein are subject to change by legislative power, where the change is reasonably necessary in the public interest to promote the general welfare of the people of the state. *We have never held one to have a vested right in the common-law rules governing negligence actions so as to preclude substituting a viable statutory remedy for common law causes of action.*" (Emphasis added.) 214 Kan. at 599.

We have repeated this language, or referred back to it, on numerous occasions. See, *e.g.*, *Bair*, 248 Kan. at 839; *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 613, 576 P.2d 221 (1978). And in more recent years, the quid pro quo test for a Section 18 analysis has articulated the second part of the test as requiring an "adequate" substitute remedy instead of a "viable" statutory remedy, but there appears to be little substantive difference in the terminology. *Cf. Lemuz*, 261 Kan. 936, Syl. ¶ 4; *Bonin v. Vannaman*, 261 Kan. 199, Syl. ¶ 11, 929 P.2d 754 (1996). Accordingly, we apply next the quid pro quo analysis for both Section 5 and Section 18 purposes.

*Sections 5 and 18 Quid Pro Quo Analysis*

A two-step analysis is required for the quid pro quo test. For step one, we determine whether the modification to the common-law remedy or the right to jury trial is reasonably necessary in the public interest to promote the public welfare. This first step is similar to the analysis used to decide equal protection questions under the rational basis standard. *Lemuz*, 261 Kan. at 948. For step two, we determine whether the legislature substituted an adequate statutory remedy for the modification to the individual right at issue. This step is more stringent than the first because even if a statute is consistent with public policy, there still must be an adequate substitute remedy conferred on those individuals whose rights are adversely impacted. *Lemuz*, 261 Kan. at 948; *Bonin*, 261 Kan. at 217-18; *Aves v. Shah*, 258 Kan. 506, 521-22, 906 P.2d 642 (1995); *Samsel II*, 246 Kan. at 358, 361; *Manzanares*, 214 Kan. at 599.

In *Samsel II*, which was the last time we considered whether the $250,000 cap on noneconomic damages passed the quid pro quo test, this court held that it did in a case involving a personal injury plaintiff. And because of that, we must decide first whether we can simply accept the *Samsel II* rationale and perform the quid pro quo analysis to result in Johnson's favor. We are urged to do that by Johnson and several *amici*, but there are three principal reasons we will not rely on *Samsel II* for this case.

First, *Samsel II* was not a medical malpractice case affected by the Health Care Provider Insurance Availability Act, K.S.A. 40-3401 *et seq*. That Act requires health care providers to carry a minimum amount of insurance in order to practice in Kansas and also makes available additional excess coverage through the Health Care Stabilization Fund. See K.S.A. 40-3402 (mandatory coverage); K.S.A. 40-3408 (excess coverage). This mandated coverage for her doctor arguably gives Miller an individualized substitute remedy in the form of a guaranteed source of recovery for some of her damages, and these same source-of-recovery provisions have been found to give other medical malpractice plaintiffs an adequate substitute remedy in other cases. *Bair*, 248 Kan. at 844; *Aves*, 258

Kan at 523-24; *Lemuz*, 261 Kan. at 959. This is something general tort litigants (such as the plaintiff in *Samsel II*) do not have, and these provisions should be considered as part of the quid pro quo analysis when applied to Miller's constitutional challenge to K.S.A. 60-19a02.

Second, the $250,000 cap on noneconomic damages has not increased since *Samsel II*. And as Miller points out without any real contradiction, the cap today provides less commensurate remedy than when the legislature set it in 1988. This is due, of course, to the reduction in buying power that accompanies inflation, and our court has made clear that it is possible for a substitute remedy that was adequate when originally enacted to become inadequate over time or because of changed circumstances. As we noted in *Bair*: "The legislature, once having established a substitute remedy, cannot constitutionally proceed to emasculate the remedy, by amendments, *to a point where it is no longer a viable and sufficient substitute remedy*." (Emphasis added.) *Bair*, 248 Kan. at 844. The same can be said for inflationary effects and legislative inaction over time when dealing with a fixed dollar amount. *Samsel II* does not address this, and it is a legitimate issue for reflection in this case.

Third, *Samsel II* premised its inquiry at step two on an interpretation of K.S.A. 60-19a02(d)'s impact on a trial court's authority to order a new trial that we cannot accept. K.S.A. 60-19a02(d) states in part that "[i]f the verdict results in an award for noneconomic loss which exceeds the limits of this section, *the court shall enter judgment for $250,000 for all the party's claims for noneconomic loss*." (Emphasis added.) The *Samsel II* court held the italicized language prohibits trial courts from awarding "less than $250,000 when higher damages are awarded by the jury." *Samsel II*, 246 Kan. at 362. And from that construction, the court reasoned that the cap protected personal injury plaintiffs from "conservative" judges, who might more drastically reduce a verdict below $250,000, and in that manner statutorily substituted an adequate remedy for the rights taken away by the cap. 246 Kan. at 361-62. But we hold that *Samsel II* erred on this point.

K.S.A. 2011 Supp. 60-259(a)(1)(C) and (D) authorize a trial court to order a new trial when it finds a verdict is the result of

passion or prejudice, or is contrary to the evidence. The purpose for this authority is to allow a district court to remedy an improper jury verdict. *Samsel II* did not address this express statutory authority or consider whether there was any reason to believe K.S.A. 60-19a02 was intended to override K.S.A. 2011 Supp. 60-259(a)(1)(C) and (D).

As noted in the *amici* brief by Professors Rich and Concannon, the *Samsel II* analysis went beyond the plain language of K.S.A. 60-19a02(d) to speculate that the legislature intended to substitute those provisions as a remedy for the cap on noneconomic damages. For example, they point out that if a jury awards $400,000 in noneconomic damages, it is illogical to believe the legislature expected a trial court to simply reduce the award to a flat $250,000— if the trial court believed the evidence supported an award *less* than $250,000. Otherwise, it would mean the legislature intended for that plaintiff to receive more than the evidence supported, which is highly unlikely. And nothing in the legislative history demonstrates a trial court was not supposed to continue exercising its ordinary powers of remittitur over excessive jury awards unsupported by the evidence. *Samsel II* read too much into K.S.A. 60-19a02(d) . We reject this portion of *Samsel II's* holding.

For these reasons, we determine that *Samsel II* does not resolve whether an adequate substitute remedy exists for the encroachments on the Section 5 right to jury trial and Section 18 right to remedy caused by the $250,000 noneconomic damages cap set out in K.S.A. 60-19a02. Accordingly, we move next to the first step in the two-step analysis to consider whether the noneconomic damages cap is reasonably necessary in the public interest to promote the public welfare. *Lemuz*, 261 Kan. at 949. We hold that it is.

As noted in several of our prior cases, the legislature's expressed goals for the comprehensive legislation comprising the Health Care Insurance Provider Availability Act and the noneconomic damages cap have long been accepted by this court to carry a valid public interest objective. 261 Kan. at 949 (ensuring quality health care availability in the state is a valid legislative objective that promotes the general welfare); *Bonin*, 261 Kan. at 216 (affordable and available malpractice insurance for doctors and the continued availa-

bility of health care in Kansas are legitimate state interests); *Aves*, 258 Kan. at 526 (same); *State ex rel. Schneider*, 223 Kan. at 620 (same). And in *Farley v. Engelken*, 241 Kan. 663, 684-85, 740 P.2d 1058 (1987) (Holmes, J., dissenting), the dissent more declaratively stated that it is "clear the court has accepted the legitimacy of the state's interest in assuring the continued availability of health care to the citizenry and the legislature's determination that a medical malpractice insurance crisis exists."

Johnson correctly points out that Miller does not argue the legislature's goals in making medical malpractice insurance readily available for the state's health care providers do not fall within the public interest rubric. Instead, Miller contends the cap was—and is—not necessary to achieve those goals. But it is not necessary for a court to make a factual determination whether the cap definitely would lower insurance premiums, or has lowered them. The potential is enough. *Lemuz*, 261 Kan. at 949 ("Peer review has the potential to lower malpractice incidents, thereby lowering malpractice rates and thereby encouraging doctors to practice in Kansas."). Given this, our caselaw generally settles the first step in the quid pro quo analysis in favor of the statute's constitutionality.

Moving to the second step, we must determine whether the legislature substituted an adequate statutory remedy for the modification of the individual rights at issue, which in this case concerns the constitutional protections afforded to Miller by Section 5 and Section 18. *Lemuz*, 261 Kan. at 948. We hold that it does.

We begin by considering what Miller has lost and try to put that loss in perspective with our prior caselaw and the legislation that impacts her recovery in this litigation. For Miller, the noneconomic damages cap unquestionably functions to deprive her of a portion of her noneconomic damages, which the jury awarded based upon the evidence presented at trial. Miller's loss must be viewed as being significantly more serious than deprivations found in some of our cases that previously embarked on the quid pro quo analysis. See *e.g., Lemuz*, 261 Kan. 936 (abrogation of corporate negligence action); *Aves*, 258 Kan. 506 (prohibiting bad faith actions against the Health Care Stabilization Fund); *Bair*, 248 Kan. 824 (eliminating vicarious liability of employer health care providers); *Man-*

*zanares v. Bell*, 214 Kan. 589, 522 P.2d 1291 (1974) (prohibiting suit below a minimum threshold). But she has not been left without any compensation for her loss as other plaintiffs in some of our other cases. See *Bonin*, 261 Kan. 199 (special statute of repose for minors and persons with legal disability); *Rajala v. Doresky*, 233 Kan. 440, 440, 661 P.2d 1251 (1983) (fellow employee immunity in workers compensation statutes); *Neely*, 192 Kan. at 716 (immunity from judgment for nonprofit hospitals).

It is also noteworthy that there is no cap on total damages awarded in the verdict. This is not true in all states, as some jurisdictions limit the total damages receivable. See, *e.g.*, Colo. Rev. Stat. § 13-64-302 (2011) ($300,000 limit on noneconomic damages in medical malpractice actions; $1 million total cap); Ind. Code § 34-18-14-3 (2008) ($1,250,000 total cap); Neb. Rev. Stat. § 44-2825 (2010) ($1.75 million total cap in medical malpractice actions). Therefore, the deprivation caused by K.S.A. 60-19a02, although very real, is limited in its scope. This is a substantial consideration when deciding how adequate the substitute remedy provided by the legislature must be.

In addition, major statutory enactments establishing a broad, comprehensive statutory remedy or scheme of reparations in derogation of a previously existing common-law remedy may be subsequently amended or altered without each such subsequent change being supported by an independent and separate quid pro quo. *Lemuz*, 261 Kan. at 955 (citing *Bair*, 248 Kan. at 842). Our caselaw does not require us to look only to a contemporaneous quid pro quo within the same statutory enactment containing the noneconomic damages cap.

As a medical malpractice plaintiff, Miller's damages cap operates within the context of the comprehensive statutory scheme created in the Health Care Provider Insurance Availability Act. And as mentioned, the Act mandates that all health care providers—as a condition to providing health care services in Kansas—maintain professional liability insurance with an approved company of not less than $200,000 per claim, subject to not less than a $600,000 annual aggregate for all claims made during the policy period. K.S.A. 40-3402(a). It also requires that health care providers elect

one of three levels of excess coverage from the Health Care Stabilization Fund, ranging from $100,000 to $800,000. K.S.A. 40-3403(l). And it requires that every health care insurer participate in an apportionment plan so that health care providers who are entitled to insurance, but unable to acquire it through ordinary methods, may obtain insurance. K.S.A. 40-3413(a). These provisions make the prospects for recovery of at least the statutory minimums directly available as a benefit to medical malpractice plaintiffs when there is a finding of liability. This is something many other tort victims do not have.

In both *Bair* and *Lemuz*, we found these mandatory insurance and excess coverage provisions gave an adequate substitute remedy for the modification of common-law remedies at issue in those cases. See *Bair*, 248 Kan. 824 (abrogation of corporate negligence action); *Lemuz*, 261 Kan. 949 (eliminating vicarious liability of employer health care providers). And in the context of our workers compensation and no-fault automobile insurance caselaw, we have found the requirement of reliable sources of partial recovery for serious injuries to be significant in the quid pro quo analysis in deciding what constituted an adequate substitute remedy. See, *e.g.*, *Rajala*, 233 Kan. 440.

For Miller, having an available source of recovery of the statutorily mandated minimums provides her with a significant, individualized substitute remedy. And as pointed out by more than one *amici*, a judgment that cannot be collected is worthless. So under this statutory scheme, Miller has an obvious direct benefit not available to all others. But this alone does not necessarily settle the question whether the legislatively substituted remedy is adequate. Also important is the amount of the cap; and as to this, there is a reasonable question as to the continued adequacy of the $250,000 limitation that has admittedly devalued over time due to the legislature's failure to adjust it. We must consider this question next.

Miller cites the Consumer Price Index Inflation Calculator to argue that in 2007 dollars, the cap was equivalent to $142,223.37, which represents a 57 percent erosion in buying power since 1988. And we note the original 1986 cap on noneconomic damages in medical malpractice actions provided for annual adjustments based

on the consumer price index. K.S.A. 1986 Supp. 60-3407(d). But this cost-of-living adjustment is no longer part of the statutory scheme. See K.S.A. 60-19a02.

Johnson urges the court to reject the argument that inflation has rendered the quid pro quo to Miller inadequate. Drawing from the language in *Manzanares*, 214 Kan. at 611, the doctor argues that, " '[w]hen it is seen that a line or point there must be, and there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark.' " Johnson also points out that other states' legislative bodies have more recently considered enacting a noneconomic damages cap of $250,000, suggesting that this shows "Miller cannot establish that inflation has rendered $250,000 'very wide of any reasonable mark' in 2008." Similarly, some *amici* briefs point out that our legislature has considered—but rejected—increasing the cap on numerous occasions, which they argue implies a substantive determination by lawmakers that the cap remains adequate.

But Johnson's reliance on *Manzanares* occurs out of context. The passage the doctor recites was considering the $500 threshold the legislature set for denying a plaintiff's ability to file a claim for nonpecuniary damages. It was not considering a legislatively determined amount that would serve as the adequate substitute remedy for the deprivation of rights caused by that threshold. 214 Kan. at 611. Instead, what was decided in *Manzanares* to be the adequate substitute remedy was the direct benefit to motor vehicle accident victims of ready payment for certain damages that were guaranteed by the statutorily required insurance levels. 214 Kan. at 599 ("[T]he Kansas No-Fault Act assures all motor vehicle accident victims of prompt, efficient payment of certain economic losses. To the extent there is a limitation on a person's ability to receive non-pecuniary damages, the rights received in exchange are no less adequate."). Johnson seriously misreads *Manzanares* as to this point.

Moreover, the "wide of any reasonable mark" standard from our caselaw referenced by Johnson derives from the rational basis standard applied in equal protection cases. See, *e.g.*, *Peden v. Kansas*

*Dept. of Revenue*, 261 Kan. 239, 258-59, 930 P.2d 1 (1996) (discussing equal protection); *State ex rel. Schneider*, 223 Kan. at 619. And while we already give deference to the legislature in step one of the quid pro quo analysis when determining whether a modification to a common-law right is reasonably necessary in the public interest to promote the public welfare, the analysis in step two is a more stringent test. And the issue is whether there is an adequate substitute right in the place of the Section 5 and Section 18 rights diluted by the legislation—not whether the legislature acted wide of any reasonable mark. To give the same deference to legislative decision-making at the second step of the quid pro quo test as the first would reduce the analysis to one step. The protections afforded by Section 5 and Section 18 are not simply aspirational statements easily vulnerable to legislative encroachment. *Samsel II*, 246 Kan. at 348 ("Our constitution does not make this court the critic of the legislature; rather, this court is the guardian of the constitution . . . ."); *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 760, 408 P.2d 877 (1965) (same).

As to the fact that there are other states with a $250,000 cap on noneconomic damages and other jurisdictions that recently considered setting a cap at that amount, our review of other states' legislation shows it is difficult to accurately—and fairly—compare what other states do in this regard. For example, there are wide variations in specific provisions, such as method of computation, statutory exceptions for permanent disfigurement or gross negligence, annual adjustments for inflation, and applicability per occurrence, per claimant, and per defendant. See Hubbard, *The Nature and Impact of the "Tort Reform" Movement*, 35 Hofstra L. Rev. 437, 497-99 (Winter 2006) (attempting to summarize various state caps provisions and providing examples of the unique variations and ranges involved). We find Johnson's argument based on other states' legislation unpersuasive.

This leads us to Miller's argument that the passage of time has rendered the statutory cap unconstitutional. And admittedly, the legislature's failure to increase the $250,000 cap on noneconomic damages over the more than 20 years since it first set that amount is troubling to this court. To be sure, the legislature has periodically

increased other statutorily mandated limits on liability. For example, the legislature has increased an employer's liability for workers compensation benefits under K.S.A. 44-510f. *Cf.* L. 1974, ch. 203, sec. 16 ($50,000); L. 1979, ch. 156, sec. 8 (increasing employer's liability to either $75,000 or $100,000); L. 1987, ch. 187, sec. 8 (increasing it to $100,000 and $125,000 respectively); L. 2011, ch. 55, sec. 10 (increasing some benefit limits to $130,000 and $155,000). The legislature has also increased the limits on damages recoverable in wrongful death actions under K.S.A. 60-1903. *Cf.* L. 1984, ch. 214, sec. 1 ($100,000 limitation on nonpecuniary loss); L. 1998, ch. 68, sec. 1 (increased to $250,000 limit on nonpecuniary loss). The legislature has also tied a fixed dollar amount to a consumer price index in other circumstances. See, *e.g.*, K.S.A. 20-2609 (adjusting judicial retirement benefits after disability benefits by considering consumer price index for urban consumers); K.S.A. 74-4927 (same for public employees retirement system).

But despite our concern, we cannot say at this time that the legislature's failure to increase the statutory cap has sufficiently diluted the substitute remedy to render the present cap clearly unconstitutional when viewed in light of the other provisions in the Act that directly and exclusively benefit a medical malpractice plaintiff. As we have noted previously, "[e]ach case must be decided on its own merit, for our law does not require a complete balance and equality between the benefits conferred by statute in the place of the common-law remedy." *KPERS v. Reimer & Koger Assocs., Inc.*, 261 Kan. 17, 39, 926 P.2d 466 (1996). We hold that the legislature has substituted an adequate statutory remedy for the modification of the individual rights at issue, which in this case concern the constitutional protections afforded to Miller by Section 5 and Section 18.

*Equal Protection Analysis*

Equal protection rights derive from Section 1 of the Kansas Constitution Bill of Rights, which states: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." Section 1 and the Fourteenth Amendment to the United States Constitution provide virtually the

same protections. *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 315, 255 P.3d 1186 (2011). An equal protection analysis has three steps.

The first is to determine the nature of the statutory classification and whether that classification results in arguably indistinguishable classes of individuals being treated differently. The Section 1 Equal Protection Clause is only implicated if there is differing treatment among similarly situated individuals. *Kanza Rail-Trails Conservancy*, 292 Kan. at 315. The party challenging the statute's constitutionality has the burden of demonstrating he or she is similarly situated to others treated differently. *State v. Huerta*, 291 Kan. 831, 834, 247 P.3d 1043 (2011). The second step examines the rights affected by the classification because the nature of those rights dictates the level of scrutiny applied to justify the classification. There are three levels of scrutiny: (1) the rational basis standard to determine whether a statutory classification bears some rational relationship to a valid legislative purpose; (2) a heightened or intermediate scrutiny to determine whether a statutory classification substantially furthers a legitimate legislative purpose; and (3) the strict scrutiny standard to determine whether a statutory classification is necessary to serve some compelling state interest. *Kanza Rail-Trails Conservancy*, 292 Kan. at 316. The final step requires determining whether the relationship between the classifications and the object desired to be obtained withstands the applicable scrutiny. 292 Kan. at 316.

Miller begins her equal protection attack by arguing that the cap disparately impacts women and the elderly. And in the *amici* brief submitted by AARP *et al.*, this argument is expanded to allege the cap has a disproportionate impact on children, racial and ethnic minority groups, and low-income persons. But as Johnson correctly points out, a facially neutral statute challenged under equal protection on the basis it has a discriminatory effect requires "not only that there is a disparate impact, but also that the impact can be traced to a discriminatory purpose." *Montoy v. State*, 278 Kan. 769, 771, 120 P.3d 306 (2005) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S. Ct. 2282, 60 L. Ed. 2d 870 [1979]). If we simply jump to that latter point, Miller offers

nothing to show the cap was motivated by an intent to discriminate against women or the elderly, and neither does the AARP *et al.* Our own review of the legislative history fails to disclose any such discriminatory purpose. We hold the cap "is not unconstitutional based solely on its 'disparate impact.' " *Montoy*, 278 Kan. at 771.

Next, Miller argues the statutory cap treats personal injury plaintiffs differently based on whether their noneconomic damages are higher or lower than $250,000. This is obviously true. A plaintiff who sustains less serious injuries is entitled to full compensation, while a plaintiff who sustains more than $250,000 in noneconomic damages is not. Therefore, step one is satisfied.

Moving to step two regarding the nature of the right affected and the level of scrutiny required, Miller contends the noneconomic damages cap should be evaluated under the strict scrutiny standard because it affects her fundamental rights of trial by jury and remedy by due course of law. But the problem with this strict scrutiny argument is that the jury trial right under Section 5 and the right to remedy under Section 18 have never been held to be fundamental rights for equal protection purposes. And while Miller cites *Gard v. Sherwood Construction Co.*, 194 Kan. 541, 549, 400 P.2d 995 (1965), for the statement that the right to jury trial is "a fundamental feature of American jurisprudence" and *Adams v. St. Francis Regional Med. Center*, 264 Kan. 144, 173, 955 P.2d 1169 (1998), for a statement that the right to a remedy is fundamental, these cases do not concern equal protection and neither supports declaring such rights "fundamental" for equal protection purposes. Thus, Miller's rationale for applying strict scrutiny is not persuasive.

But we also take issue with Johnson's claim that the rational basis test obviously applies based on our previous caselaw. For this claim, Johnson relies on language in *Samsel II* in which the court considered whether the cap met the "reasonably necessary" prong of the quid pro quo analysis. But neither *Samsel II* nor *Kansas Malpractice Victims* addressed whether the noneconomic damages caps in controversy violated equal protection. See *Samsel II*, 246 Kan. at 337, 363 (court's decision addressed only Sections 5 and 18); *Kansas Malpractice Victims*, 243 Kan. at 352 ("We agree with the trial

court that it makes no real sense to apply an equal protection argument analysis . . . when the result in the case is controlled by Sections 5 and 18 of the Kansas Bill of Rights."). We decline to read such a holding into the *Samsel II* court's analysis when addressing constitutional challenges not expressly addressed in that decision. Nevertheless, and for different reasons, we agree the rational basis standard applies to Miller's equal protection challenge. We apply it because K.S.A. 60-19a02 is economic legislation.

It is well-established that statutes limiting liability and recovery of damages, like the restriction on noneconomic damages in K.S.A. 60-19a02, are considered social and economic legislation that trigger application of the rational basis test. See, *e.g., Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 83, 98 S. Ct. 2620, 57 L. Ed. 2d 595 (1978) (statute limiting licensed nuclear power plants is "classic example" of economic regulation because it "accommodate[s] the 'burdens and benefits of economic life' " and the rational basis test applies); *KPERS v. Reimer & Koger Assocs., Inc.*, 261 Kan. 17, 41-43, 927 P.2d 466 (1996) (applying rational basis standard because statutory liability limitations for parties entering KPERS settlement agreement are social and economic legislation); *Leiker v. Gafford*, 245 Kan. 325, 363, 778 P.2d 823 (1989) (statute capping nonpecuniary damages in wrongful death action is economic legislation reviewed under rational basis standard). To satisfy the rational basis standard under step three of the analysis, the statutory classification must bear some rational relationship to a valid legislative purpose. *Kanza Rail-Trails Conservancy*, 292 Kan. at 316. The party attacking a statute as facially unconstitutional for failing to satisfy the rational basis standard has the burden to negate every conceivable rational basis that might support the classification challenged. *Downtown Bar and Grill v. State*, 294 Kan. 188, Syl. ¶ 10, 273 P.3d 709 (2012).

Miller argues K.S.A. 60-19a02 fails to meet the rational basis standard, citing the information she proffered to the district court alleging there was no credible evidence of a medical malpractice insurance crisis or that it was caused by medical malpractice and tort litigation awards. From this, she argues no rational relationship exists between the statutory cap on noneconomic damages and the

legislature's objective of curing the medical malpractice insurance and liability insurance "crises" by lowering malpractice and liability insurance premiums.

But as we stated above in discussing the quid pro quo analysis, the legislative history and evidence offered by the parties and the *amici* show there was—and still is—conflicting evidence regarding the existence and causes of the medical malpractice insurance and liability insurance "crises" and whether there is any necessity for, or efficacy of, a cap on noneconomic damages. See *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S. Ct. 715, 66 L. Ed. 2d 659 (1981) ("Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken."); *United States v. Carolene Products Co.*, 304 U.S. 144, 154, 58 S. Ct. 778, 82 L. Ed. 1234 (1938) ("[if] it is evident from all the considerations presented to Congress, and those of which we may take judicial notice, that the question is at least debatable[,] . . . that decision was for Congress, [and a] finding of a court arrived at by weighing the evidence . . . can[not] be substituted for it"). See also *Downtown Bar*, 294 Kan. at 198 (citing *Peden*, 261 Kan. at 263) (legislative choice may be based on rational speculation unsupported by evidence or empirical data).

The legislature enacted K.S.A. 60-19a02 in an attempt to reduce and stabilize liability insurance premiums by eliminating both the difficulty with rate setting due to the unpredictability of noneconomic damages awards and the possibility of large noneconomic damage awards. See Report of the Citizens Committee on Legal Liability, pp. 5-7, 64 (1986) (insurers were setting premiums based on worst-case scenarios, resulting in high premiums and unavailability because some were reluctant to assume the liability risk); House Judiciary Committee Minutes, March 3, 1987 (testimony concerning the difficulty insurers had setting rates because noneconomic damages are unpredictable and limitless; the possibility of large awards hinders settlements; and reasonable cap would stabilize cost and availability over the long term); House Judiciary Committee minutes, January 21, 1986, January 22, 1986, and Jan-

uary 23, 1986 (testimony concerning effects of the severity of medical malpractice insurance claims on premium increases and unavailability of insurance; problems included the unpredictability of large awards, which hampers insurers' ability to accurately predict losses and price their product accordingly; a cap on damages was necessary to stabilize premium rates and bring more insurers back into the market); Report on Kansas Legislative Interim Studies to the 1986 Legislature, pp. 846, 847 (Table VIII) (1985) (actuaries presented evidence concerning effect of various caps on Fund surcharges; estimated that a $1 million total cap with a cap of $500,000 on noneconomic damages could reduce Fund surcharge for 1986-87 by 3 percent and by 10 percent for 1987-88).

And although the applicable standard does not require it, there is evidence within the legislative history of K.S.A. 60-19a02 demonstrating a rational basis for limiting noneconomic damages and treating more egregiously injured plaintiffs differently by the setting of a statutory cap on such damages. We hold that it is "reasonably conceivable" under the rational basis standard that imposing a limit on noneconomic damages furthers the objective of reducing and stabilizing insurance premiums by providing predictability and eliminating the possibility of large noneconomic damages awards. See *Downtown Bar*, 294 Kan. at 195-99. We hold the statutory cap of K.S.A. 60-19a02 does not violate the equal protection guarantees of Section 1.

## *Separation of Powers Analysis*

"The doctrine of separation of powers is not expressly set forth in either the United States or Kansas Constitutions. However, it has long been recognized that the very structure of our three-branch system gives rise to the doctrine." *State v. Beard*, 274 Kan. 181, 185, 49 P.3d 492 (2002). "[T]he doctrine of separation of powers is an inherent and integral element of the republican form of government . . . ." *Van Sickle v. Shanahan*, 212 Kan. 426, 447, 511 P.2d 223 (1973). Miller argues that the noneconomic damages cap enacted by the legislature abolishes the judiciary's authority to order new trials and robs judges of their judicial discretion by func-

tioning as a statutory remittitur effectively usurping the court's power to grant remittiturs. We disagree.

In *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, Syl. ¶ 5, 687 P.2d 622 (1984), this court held that the legislative branch impermissibly intruded upon the executive branch's power by enacting a statute giving the legislature control over administrative rules and regulations. We struck down the offending legislation, stating:

"The doctrine of separation of powers is an outstanding feature of the American constitutional system. The governments, both state and federal, are divided into three branches, *i.e.*, legislative, executive and judicial, each of which is given the powers and functions appropriate to it. Thus, a dangerous concentration of power is avoided through the checks and balances each branch of government has against the other. [Citations omitted.] Generally speaking, the legislative power is the power to make, amend, or repeal laws; the executive power is the power to enforce the laws; and the judicial power is the power to interpret and apply the laws in actual controversies. [Citation omitted.]" *State ex rel. Stephan*, 236 Kan. at 59.

And while these general descriptions of the power held by a branch of government suggests each occupies a separate sphere, "[i]n reality, there is an overlap and blending of functions, resulting in complementary activity by the different branches that makes absolute separation of powers impossible." *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 883, 179 P.3d 366 (2008). Therefore, we have held that a usurpation of powers exists when one branch of government significantly interferes with the operations of another branch. And to make this determination, a reviewing court considers: (1) the essential nature of the power being exercised; (2) the degree of control by one branch over another; (3) the objective sought to be attained; and (4) the practical result of blending powers as shown by actual experience over a period of time. *State ex rel. Morrison*, 285 Kan. at 884.

Article 3, section 1 of the Kansas Constitution establishes the source and extent of the judicial power that Miller contends is abrogated by the noneconomic damages cap. It states:

"The judicial power of this state shall be vested exclusively in one court of justice . . . . The supreme court shall have general administrative authority over all courts in this state." Kan. Const. art. 3, § 1.

This provision makes clear that judicial power is exclusively vested in the unified court system, but it does not define what constitutes "judicial power." Our caselaw has traditionally summarized the term as "the power to hear and determine a cause and the rights of the parties to a controversy, and to render a binding judgment or decree based on present or past facts under existing laws." *State v. Mitchell*, 234 Kan. 185, 194, 672 P.2d 1 (1983). In addition, the constitution grants this court administrative authority over the Kansas court system, which has been described as the power to "promulgate and enforce reasonable rules regulating judicial administration and court procedure as necessary for the administration of justice." *Mitchell*, 234 Kan. at 194.

But before turning to the merits of Miller's separation of powers argument, we address first Johnson's threshold contention that this court already ruled against Miller on this challenge in *Samsel I*— the preliminary opinion released to inform the parties of the case's outcome before the full *Samsel II* opinion could be prepared and filed. Johnson refers in isolation to the *Samsel I* answer to the certified question posed by the federal court: "Neither the original nor the amended version of 60-19a01 *violates the Constitution of the State of Kansas.*" (Emphasis added.) *Samsel v. Wheeler Transport Services, Inc.*, 244 Kan. 726, 727, 771 P.2d 71 (1989). Johnson then stretches this court's simple advisory to argue that by so broadly stating the statute did not violate the Kansas Constitution, this court "presumably" considered whether the statute violated the separation of powers and determined it did not. Such an argument, however, denies reality and ignores this court's more complete analysis that followed in *Samsel II*, which clearly stated the constitutional claims the court reviewed. *Samsel II* did not address separation of powers. It held only that the statute did not violate Sections 5 (right to jury trial) and 18 (right to remedy by due process of law). *Samsel II*, 246 Kan. at 363. The doctor's attempt to seize on the general language in *Samsel I* to extend its holding to the four corners of the Kansas Constitution is without merit.

Returning now to the arguments Miller advances, she contends K.S.A. 60-19a02 violates separation of powers because it abolishes the judiciary's authority to order new trials if the jury's award is

inadequate, and because it is an inflexible cap that robs judges of their judicial discretion by functioning as a statutory remittitur effectively usurping the court's inherent, exclusive, and constitutionally protected power to grant remittiturs. Miller specifically argues that the cap "completely abolishes judicial discretion to award noneconomic damages in any amount above or below $250,000." Johnson counters that the court's authority to grant remittitur or order a new trial exists only in the absence of a statute to the contrary and that "a general modification of the damages recoverable in personal injury cases is within the *legislative* power, not the judiciary." The doctor also notes that a majority of courts considering this issue have held damages caps do not violate separation of powers.

Miller's claim that K.S.A. 60-19a02 violates separation of powers because it unconstitutionally limits the trial court's authority to order a new trial unless remittitur is accepted is premised upon this court's holding in *Samsel II* that K.S.A. 60-19a02 prohibits a trial court from entering an award for less than $250,000, even if the evidence supports less. We overruled the *Samsel II* court's analysis as to this issue in our quid pro quo discussion above, so this claimed violation of separation of powers is without merit. K.S.A. 60-19a02(d) imposes a cap on noneconomic damages that prevents the trial court from awarding more than $250,000, but it does not prevent a trial court from granting a new trial when permitted by K.S.A. 2011 Supp. 60-259 and the evidence.

As to Miller's second argument that K.S.A. 60-19a02 violates separation of powers because it is an "inflexible cap" that robs judges of their judicial discretion, we hold this argument to be without merit because we disagree with Miller's characterization of the cap as a statutory remittitur. The power of remittitur is incident to the power to grant a new trial after the verdict is determined to be excessive under K.S.A. 2011 Supp. 60-259 because it is based upon prejudice, passion, or insufficient evidence. When a verdict is excessive for any of these reasons, the trial court as a matter of law refuses to accept it and offers the prevailing party the option of a reduced verdict more in line with the evidence. And if the party refuses, the court orders a new trial. *Dixon v.*

*Prothro*, 251 Kan. 767, 770, 840 P.2d 491 (1992). The cap is not a "statutory remittitur" because it is not conditioned on an erroneous verdict, nor is it conditioned on the prevailing party's acceptance. We hold that Miller's second argument is without merit.

Miller's third argument is that the cap violates the separation of powers doctrine because it can prevent a trial court from ordering a new trial unless the losing party accepts an *increased* award through additur when the jury awards less than $250,000 and the evidence supports a greater award. But that assertion is not entirely true. The trial court may still order a new trial so long as the losing party accepts a higher award up to the $250,000 limitation. It would only be when a trial court sought to use additur or remittitur to create an award *greater* than $250,000 that the statutory cap intercedes to prevent it.

In this respect, K.S.A. 60-19a02 does create some limitation on when it would be sensible for a trial court to exercise its authority to order a new trial under K.S.A. 2011 Supp. 60-259 in lieu of additur or remittitur. If the verdict is greater than $250,000 and the court determines that, as a matter of law, the verdict would be more in line with the evidence if reduced to another dollar value greater than $250,000, the court will forgo ordering a new trial because the cap would render such effort futile. Similarly, it would be pointless for the trial court to order a new trial unless the losing party consents to a higher verdict through additur of more than $250,000.

It is this de facto restriction on the trial court's exercise of the power to order a new trial in lieu of additur or remittitur that is at the heart of Miller's separation of powers claims. But Miller overlooks that this judicial power depends upon the trial court's determination that the jury verdict is inappropriate on some basis. This means that the question presented is whether it violates the separation of powers doctrine when the legislature enacts statutes that restrict when a trial court may order a new trial in lieu of additur or remittitur.

The powers to grant a new trial or offer additur or remittitur originally stemmed from the common law. See *Samsel II*, 246 Kan. at 359 (discussing the court's common-law authority to grant a new

trial when the verdict is inadequate). But since the enactment of the Code of Civil Procedure, the statutory basis for granting a new trial is exclusive. Thus, a trial court has no jurisdiction to grant a new trial for a reason not provided in the statute. See, *e.g.*, *Mettee v. Urban Renewal Agency*, 219 Kan. 165, 167-68, 547 P.2d 356 (1976). And, as this court noted in *Samsel II*, at one time the new trial statute prohibited granting a new trial because a verdict was inadequate, which as a practical matter prohibited a trial court from ordering a new trial in lieu of additur. *Samsel II*, 246 Kan. at 359 (citing G.S. 1901, 4755). In *Railway Co. v. O'Neill*, 68 Kan. 252, 254, 74 P. 1105 (1904), this court recognized the legislature could "regulate the matter of the granting of new trials" in this manner.

The long-standing legislative influence in these matters weighs against finding the separation of powers doctrine is violated by K.S.A. 60-19a02 when considered in light of the four factors articulated in *State ex rel. Morrison v. Sebelius* that guide consideration of whether the doctrine was violated. The legislature has exercised some control over the judicial power to grant a new trial if a party does not accept the court's offer of additur or remittitur over many years. In actual experience, this has not yielded significant adverse results.

Finally, and as we have already noted, the judiciary has "tolerated" the legislature's regulation of the court's power to grant new trials since at least 1904, when the court in *Railway Co.*, 68 Kan. at 254, recognized that the legislature could "regulate the matter of the granting of new trials," including the power to prohibit new trials based on the inadequacy of an award of damages. This court has also recognized that a court's authority to grant a new trial is limited to the six enumerated grounds provided by the legislature in K.S.A. 60-259(a), which became effective January 1, 1964. *Mettee*, 219 Kan. at 168; L. 1963, ch. 303, sec. 60-259. The balance of the applicable factors weighs against finding that the cap's implicit prohibition on granting a new trial when an award of noneconomic damages is inadequate below the $250,000 cap significantly interferes with judicial power. Accordingly, we hold the cap does not violate the separation of powers doctrine.

### TRIAL ERROR CLAIMS

We address next the parties' claims that the district court erred in posttrial rulings. Miller argues the trial court erred by striking the jury's $100,000 award for future medical expenses by granting Johnson's motion to alter or amend the judgment. Johnson argues through a cross-appeal that she was entitled to judgment as a matter of law because Miller failed to prove causation of damage for the negligence allegations. Alternatively, Johnson argues she was entitled to a new trial based on three evidentiary errors. We begin by deciding Miller's claim that the jury's $100,000 award for future medical expenses should be reinstated.

*Miller's Future Medical Expenses*

The district court granted Johnson's motion to alter or amend the judgment, striking Miller's $100,000 jury award for her claimed future medical expenses. The court held that Miller offered insufficient evidence for the jury to make findings about her future medical or counseling needs, how much future care she would require, or what that cost would be over the next several decades until she reached menopause. Miller challenges that ruling, pointing out that the district court denied a similar claim during trial when the doctor raised it in a motion for directed verdict. By granting Johnson's motion to alter or amend judgment, the district court changed its position more than a year after the evidence had been heard.

Miller argues substantial competent evidence supports the jury's verdict by citing the trial testimony of Dr. Richard Derman and Dr. John Spiridigliozzi, along with Miller's medical records and bills. Miller argues the jury could have estimated the reasonable cost of her future medical expenses using the testimony and medical bills admitted into evidence. She also notes the award provides only $2,000 a year for her future health care and is reasonable given Miller's age and life expectancy. Johnson counters that this evidence is too conjectural or speculative to form a reasonable basis to measure Miller's future medical needs and the expenses required to meet those needs.

*Standard of Review*

The decision to grant a motion to alter or amend a judgment pursuant to K.S.A. 2011 Supp. 60-259(f) is within the district court's sound discretion and will not be disturbed on appeal unless there is an abuse of that discretion. *Exploration Place, Inc. v. Midwest Drywall Co.*, 277 Kan. 898, 900, 89 P.3d 536 (2004); *Mitchell v. City of Wichita*, 270 Kan. 56, 66-67, 12 P.3d 402 (2000). Judicial discretion is abused if judicial action is: (1) arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. McCullough*, 293 Kan. 970, 980-81, 270 P.3d 1142 (2012) (quoting *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 [2011]). In this case, we must focus our attention on the third inquiry—whether the trial court's ruling was based on an error of fact concerning the detail within Miller's evidence of her future medical expenses.

*Sufficiency of the Evidence for Future Medical Expenses*

In assessing the doctor's motion to alter or amend the jury's $100,000 award for future medical expenses, the district court was required to stay within certain parameters, which this court articulated in *McKissick v. Frye*, 255 Kan. 566, 591, 876 P.2d 1371 (1994), as follows:

"In a negligence action, recovery may be had only where there is evidence showing with reasonable certainty the damage was sustained as a result of the negligence. Recovery may not be had where the alleged damages are too conjectural or speculative to form a basis for measurement. To warrant recovery of damages, therefore, there must be some reasonable basis for computation which will enable the trier of fact to arrive at an estimate of the amount of loss."

Within these constraints, we must examine the medical records and billings submitted to the jury and consider the trial testimony of Miller's experts to determine whether there was a reasonable basis for the jury to compute Miller's future medical expenses.

Miller begins by noting Derman's testimony on her future medical needs. Derman is an obstetrician gynecologist with a practice "focused on preventive health care." And his expertise is with women who are becoming menopausal and postmenopausal. Derman testified in part:

"[DERMAN] . . . [B]ased upon [Miller's] history and her symptoms I determined that she would need long term estrogen therapy and because of the need to have estrogen therapy she would be regulated to long term blood thinners or Coumadin, which means that she would be getting approximately monthly blood draws [and] would be seeing the hematologist for frequent visits. That she would continue to see the gynecologist at least a couple of times a year, in terms of her— both her quality of life issues the tight traction or changing doses and needs of her hormones, the issues associated with sexual dysfunction. I also said that she possibly would require some visits with an endocrinologist to check out thyroid function. . . . I was concerned about shifting body weight. Difficulty in weight loss being certain that we were to monitor her good and bad cholesterol and triglyceride. . . . I was concerned with long term blood thinners, and the fact that she went through surgical menopause, that there might be an increased risk of bone loss and osteoporosis. I talked about the importance of getting what we call a bone test or DXA test, as well as, getting her routine mammography and all of her immunizations up-to-date, as well as her need for psychiatric or psychological consult. I think somewhere . . . I pointed out the fact that her internist may want to get an echocardiogram, but people who have these types of conditions, these types of genetic effects may have a propensity of showing false blood clots, and in the valves of the heart, develop small clots. So, pretty much that is a summary of what I indicated would be necessary for [Miller]."

Derman explained that Miller would be dealing with being menopausal and postmenopausal, with the associated symptoms of hot flashes, insomnia, mood swings, and vaginal dryness for approximately 20 years longer than an average woman in the United States. He also discussed Miller's long-term consequences with respect to a unique blood condition, including his estimate that her blood clotting risk was approximately 60 times that of an average woman. Derman also believed Miller would need continued estrogen therapy over the next 20 to 30 years, and as a result of her blood condition would require a blood thinning agent.

Johnson's defense counsel, on the other hand, had Derman admit during cross-examination that some of Derman's recommendations applied to all women. That exchange stated:

"[DEFENSE COUNSEL]: And these are test[s] that you say that in your opinion [Miller] needs in the future, the evaluation an[d] visits?

"[DERMAN]: Yes.

"[DEFENSE COUNSEL]: Some of those things. Perhaps not as frequently and perhaps not as soon, but some of those things you recommend for all women?

"[DERMAN]: That's correct.

"[DEFENSE COUNSEL]: So, you're not trying to tell the jury only because of her condition does she need a mammogram?

"[DERMAN]: No.

"[DEFENSE COUNSEL]: Or because only because of her condition she would need a DEXA?

"[DERMAN]: But the DEXA would be done earlier.

"[DEFENSE COUNSEL]: [O]f the test that you mentioned which would you recommend to any wom[an], although maybe not as soon or not as frequently?

"[DERMAN]: Well . . . certainly a pelvic examination, a gynecological test and mammography. I would recommend to all of my patients a DEXA test at one point."

Later in the trial, Spiridigliozzi, a psychologist, provided additional testimony about Miller's future medical needs, stating:

"[SPIRIDIGLIOZZI]: Well, I think that [Miller] would benefit from seeing a professional psychologist or someone that is trained; has experience or expertise in dealing with anxiety disorders. . . . I think that she can probably use a medication evaluation too. So she could see a psychiatrist, I think that could help her reduce her anxiety[.] . . .

"Marital counseling clearly to help her and her husband deal with some of the things that have come up for them. . . . How to deal with early menopause for a wom[an]. . . . And eventually maybe the marital therapy could also incorporate the children, and become family therapy at some stage because she does say that she's very short with the children. . . . [S]he could [also] benefit from seeing a nutritionist or dietician.

"I think also she could learn more about her condition and maybe see a physical therapist, perhaps, or an occupational therapist."

With respect to the need for treatment with a psychologist, Spiridigliozzi estimated such therapy with a licensed doctoral-level psychologist at an approximate cost of $120 per hour. Spiridigliozzi also testified that the intensity and frequency of family therapy and occupation or physical therapy would depend on Miller's progress

with her one-on-one counseling. Spiridigliozzi further testified that in his professional judgment, Miller was unlikely to improve with her anxiety disorder without professional assistance.

With this expert testimony as a foundation, the final element in Miller's case for future medical expenses came from her medical records and bills that reflected her course of treatment both before and after her left ovary was mistakenly removed when she was 28 years old. Miller argues these components when viewed together gave the jury a sufficient understanding to use her medical bills and records as indicative of what the reasonable costs of her future medical expenses would be. Miller then notes that $2,000 annual average over the remainder of her life expectancy, without any adjustment for inflation, is neither excessive nor without any basis in the evidence.

In *McKissick*, this court upheld an award of $30,000 for future medical services based solely on a chiropractor's testimony that the plaintiff would require weekly treatment at a cost of $34 per visit. Similarly, in *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, 466, 856 P.2d 906 (1993), this court upheld a jury's award of damages for future medical expenses even though the experts who testified at trial could not agree on the plaintiff's future medical needs. And because both expert theories were supported by some evidence showing the costs associated with their corresponding medical treatments, this court concluded that each jury had a reasonable basis for computation of the award and was not based on mere speculation. Both of these decisions establish that the jury has a reasonable evidentiary basis to calculate future medical services if there is evidence of costs and testimony about possible future services. Certainty about the exact future services an individual will need is not required.

In *Smith v. Massey-Ferguson, Inc.*, 256 Kan. 90, 116, 883 P.2d 1120 (1994), this court approved a jury award for future medical expenses based largely upon medical expenses incurred to date. The evidence in *Smith* is comparable to the evidence Miller offered and that the jury accepted as credible. For example, the jury was aware of Miller's life expectancy and expert opinion regarding both her short-term and long-term future medical needs and had de-

tailed information about her medical expenses incurred since both of her ovaries were removed—resulting in surgical menopause. The cost information included expenses for office visits and some of her medications. Taken together, the evidence provided a general range of costs similar to what was used in *Smith* to form an adequate evidentiary basis. See 256 Kan. at 116-17. In addition, the jury was aware of Spiridigliozzi's specific testimony about Miller's need for psychological services, the possible duration, and costs ($120 per hour) typically associated with that therapy.

The district court erred by determining there was an insufficient factual basis for the jury's future medical expenses award. It mischaracterized Derman's testimony as being only about "possible" future needs, when Derman testified as to Miller's actual medical and therapeutic needs without equivocation. Similarly, the district court miscast Spiridigliozzi's testimony as being speculative concerning the benefits Miller would receive from future psychological services, when the doctor actually testified Miller *would* benefit from such services. In this manner, the testimony offered by Derman and Spiridigliozzi was similar in character to the expert's testimony in *McKissick*. See 255 Kan. at 591-92 (chiropractor testified plaintiff " 'would have to have treatment about once a week right up until she could either overcome [the injury] or it would gradually get worse, and we may have to slide it up where it would be twice a week treatment program' "). Finally, when deciding that Miller had offered no evidence as to costs, the district court did not consider the medical records and billings offered into evidence, which Miller explained was a component of her future medical expense claims.

We hold that the district court based its ruling to alter or amend the judgment on factual mischaracterizations of the evidence and a failure to consider all the evidence Miller presented to support her claim for future medical expenses. The district court premised its decision to strike the jury's award on these errors of fact. The district court's posttrial order constitutes an abuse of discretion under our standard of review. We remand the case to the district court with instructions to reinstate the jury's $100,000 award for future medical expenses.

*Johnson's Motion for Judgment as a Matter of Law*

Johnson filed a motion for judgment as a matter of law under K.S.A. 60-250, arguing that Miller failed to prove causation because Miller's medical condition often requires the removal of both ovaries. The district court denied the doctor's motion, holding that there was sufficient evidence to create a jury question. More specifically, the district court found the evidence sufficient that there was no medical indication to remove Miller's left ovary at the time Johnson performed the laparoscopic procedure and that Miller experienced a variety of problems as a result of having both ovaries removed. The district court conceded in its posttrial ruling that the evidence offered by both sides conflicted as to these points but held those inconsistencies were best resolved by the jury, which found against the doctor.

*Standard of Review*

When ruling on a motion for judgment as a matter of law under K.S.A. 60-250, the district court must resolve facts and inferences reasonably drawn from the evidence in favor of the party the directed verdict is sought against. If reasonable minds could reach different conclusions based on the evidence, the motion must be denied. An appellate court applies a similar analysis when reviewing the denial of a motion for judgment as a matter of law. The motion's consideration becomes a question of law if no evidence is presented on an issue or if evidence is undisputed and the minds of reasonable persons may not draw differing inferences or arrive at opposing conclusions. *Deal v. Bowman*, 286 Kan. 853, 858, 188 P.3d 941 (2008).

*Analysis of the Motion for Judgment as a Matter of Law*

Johnson argued to the district court after the verdict that the evidence at trial proved Miller suffered from chronic pelvic pain, which was a preexisting condition that often required removal of both ovaries and the uterus. Johnson asserted that because Miller suffered from this preexisting condition, it was outside a juror's common knowledge and experience to determine whether removal of Miller's right ovary as planned with the first surgery would have

resolved Miller's problems without later removal of her left ovary. Johnson concluded that Miller failed to prove causation because no one testified that Miller's "left ovary would not have been removed even if her right ovary had been removed [as originally planned]." In response, Miller argued that Johnson's logic was flawed because the evidence at trial proved she would be functioning well with one ovary had Johnson removed the right ovary as intended.

The district court denied Johnson's motion for judgment as a matter of law, concluding:

"Miller presented evidence through Dr. Andrew Brill that it was below the standard of care to remove the left ovary when the indication and planned surgery was for the right ovary. [Brill] testified that there was no indication for removal of the left ovary. . . . Dr. Richard Derman testified that once both ovaries were removed, Miller would experience a variety of problems, all related to the fact she did not have any ovaries. Miller established, through expert testimony, negligence and causation. Dr. Johnson presented alternative expert testimony; however, that testimony was not followed by the jury."

On appeal, the doctor continues to press the same argument made to the trial court. Johnson claims that because of Miller's preexisting medical conditions, both of her ovaries and uterus needed to be removed eventually, even if the left ovary was mistakenly taken first. The doctor argues Miller had the burden to prove that her left ovary would never have needed to be removed. Miller responds that it is sufficient she proved there was no medical justification to remove her left ovary.

To establish a medical malpractice claim, a plaintiff must show: (1) the health care provider owes the patient a duty of care and was required to meet or exceed a certain standard of care to protect the patient from injury; (2) the health care provider breached this duty or deviated from the applicable standard of care; (3) the patient was injured; and (4) the injury was proximately caused by the health care provider's breach of the standard of care. *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 420, 228 P.3d 1048 (2010).

Johnson argues Miller failed to establish the proximate cause of injury element. There are two categories of proximate cause: cau-

sation in fact and legal causation. To demonstrate causation in fact, a plaintiff must prove a cause-and-effect relationship between the defendant's conduct and the plaintiff's loss by presenting sufficient evidence from which a jury could conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred. *Puckett*, 290 Kan. at 420. Miller points to the testimony of her expert witness, Dr. Andrew Brill, and to the defendant doctor's testimony as establishing that there was no medical justification for the removal of her left ovary.

This court's review of that testimony shows Miller is correct. Brill repeatedly responded to counsel's questions by testifying there was no medical reason or justification for Johnson to have removed Miller's left ovary. Likewise, Johnson agreed with Brill's assessment that there was no medical justification for removal of the left ovary. And the district court correctly noted that Johnson's expert witnesses offered a contrary view regarding Miller's preexisting medical conditions, but this simply led to a jury question of fact that got resolved against the doctor.

We hold that the district court did not err in denying Johnson's motion for judgment was a matter of law.

*Johnson's Motion for New Trial*

The final issue concerns the district court's rejection of Johnson's motion for new trial. Johnson argued she was entitled to a new trial because the district court: (1) prevented two of Miller's treating physicians from testifying that it would have been necessary to eventually remove Miller's left ovary; (2) prevented cross-examination of a plaintiff's expert regarding professional disciplinary actions; and (3) permitted questioning of Miller about Johnson's statements in certain pleadings in which Johnson denied liability. We will address each in this order.

*Standard of Review*

Granting a new trial under K.S.A. 60-259(a) is within the trial court's discretion, and that ruling will not be disturbed on appeal unless that discretion was abused. *City of Mission Hills v. Sexton,* 284 Kan. 414, 421, 160 P.3d 812 (2007). As discussed above, judicial discretion is abused if judicial action is (1) arbitrary, fanciful,

or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *McCullough*, 293 Kan. at 980-81.

### Treating Physicians' Testimony

Johnson argues the trial court abused its discretion by restricting the testimony of Drs. Daniel Stewart and Christopher Lynch. Both doctors took over Miller's medical care after Miller's left ovary was mistakenly removed in 2002. Johnson argues on appeal that these two treating physicians should have been permitted to testify that Miller would eventually have had both ovaries removed anyway because of her preexisting medical conditions. The point of the testimony apparently was to support Johnson's argument that Miller was not damaged by Johnson's surgical error. This was a hotly contested issue before, during, and after trial.

The question first was presented as a pretrial motion in limine in which Miller objected to the proposed testimony after learning about it shortly before trial. Miller claimed Johnson had failed to properly disclose the proposed testimony during discovery, which violated prior court orders. Miller also argued that, as treating physicians, Stewart and Lynch could not offer such testimony without full expert disclosure because those opinions were outside of what was incidental to the doctors explaining their care and treatment of Miller.

The record does not provide us with the district court's pretrial ruling on the motion in limine, but it does suggest the trial court indicated it would preliminarily limit the doctors to testifying only about those matters stated in their medical records, their care and treatment of Miller, and inquiries reasonably related to that treatment, with an understanding to return to the issue as testimony developed at trial. This handling is consistent with the usual accepted trial court practice for considering motions in limine. See *Manhattan Ice and Cold Storage, Inc. v. City of Manhattan*, 294 Kan. 60, 69-70, 274 P.3d 609 (2012) (summarizing a district court's discretion and necessary considerations when ruling on a pretrial motion in limine).

As expected, the issue resurfaced at trial when the first doctor appeared to testify. At that time, the district court had a lengthy

colloquy with counsel outside of the jury's presence during which the matter was reargued. The district court then held it would not allow either doctor's testimony that the ovary Johnson removed would have needed to be removed eventually. The district court gave two reasons for its ruling. First, the court found that its pretrial orders had obligated Johnson to disclose the proposed testimony from these two doctors sooner than actually occurred—about 1 month before trial. The court found this violation of its discovery schedule and order had prejudiced Miller's ability to address the proposed testimony because the disclosure came after much of the expert discovery. Second, the district court held the limitations on these two physicians' testimony derived from K.S.A. 60-226(b)(6). At the time of Miller's trial that statute provided:

"(6) *Disclosure of expert testimony.*

"(A) A party shall disclose to other parties the identity of any person who may be used at trial to present expert testimony.

"(B) Except otherwise stipulated or directed by the court, this disclosure, with respect to a witness (i) whose sole connection with the case is that the witness is retained or specially employed to provide expert testimony in the case or (ii) whose duties as an employee of the party regularly involves giving expert witness testimony, shall state the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

"(C) These disclosures shall be made at the times and in the sequence directed by the court. . . .

"(D) Unless otherwise ordered by the court, all disclosures under this subsection shall be made in writing, signed and served. Such disclosures shall be filed with the court in accordance with subsections (d) of K.S.A. 60-205 and amendments thereto."

After trial, Johnson argued the district court had mistakenly restricted the testimony from Stewart and Lynch, that the limitation was prejudicial to the verdict against Johnson, and that a new trial should be ordered. In denying the motion for new trial, the district court simply referred back to its earlier decisions regarding this testimony and reaffirmed the rationale explained at that time, stating:

"As treating physicians the Court limited these doctors' testimony, pursuant to K.S.A. 60-226(b)(6), to matters set forth in their records, their care and treatment of Miller and subjects that were reasonably related to that treatment. After review

and consideration of the Court's previous decision in limine to exclude this testimony as well as consideration of Dr. Johnson's current motion, Dr. Johnson's motion for new trial is denied."

On appeal, Johnson argues she is entitled to a new trial because K.S.A. 60-226(b)(6) applies only to expert witnesses "whose 'sole connection with the case is that the witness is retained or specially employed to provide expert testimony . . . .' " And from that perspective, Johnson contends K.S.A. 60-226(b)(6) did not apply to the testimony of Stewart and Lynch because they were Miller's treating physicians. In the alternative, Johnson argues her supplementation of expert disclosures was timely filed under K.S.A. 60-226(e)(1), providing Miller with sufficient time to address the new testimony to be offered.

Although both parties invite us to delve more deeply into the statutory disclosure requirements for opinions that may be given by treating physicians, we find that the district court's order may be upheld on other grounds. The first justification, which is founded upon the trial court's interpretation of its own pretrial orders concerning the parties' discovery obligations, is sufficient to affirm the ruling denying the new trial. As the district court noted, it held conferences with the parties shortly before the scheduled trial and Johnson did not indicate that this subject matter would be addressed by these two witnesses. The court further noted that Johnson should have disclosed the proposed testimony even earlier pursuant to its case management order through the required witness factual summaries. The district court also specifically found that Miller was prejudiced by this delay because her expert witnesses' trial testimony had already been secured and Johnson's dilatory disclosure resulted in "unfair surprise."

K.S.A. 60-237(c) provides that a party's failure to disclose witness information required by a court's scheduling order entered pursuant to K.S.A. 60-226(b)(6)(C) precludes that testimony unless the court finds the failure was substantially justified or harmless. In this case, the district court found neither exception supported the delay. An abuse of discretion standard applies to decisions made under K.S.A. 60-237(c). *Divine v. Groshong*, 235 Kan. 127, 142, 679 P.2d 700 (1984). Additionally, we have always held that

a trial court is vested with broad discretion in supervising the course and scope of discovery. *In re Care & Treatment of Hay*, 263 Kan. 822, 839, 953 P.2d 666 (1998).

In the doctor's appellate briefs, Johnson does not address how, or even whether, the trial court misinterpreted its own scheduling orders or erred in its determinations that Johnson failed to comply with those orders, had no justification for such failure, and that the failure prejudiced Miller. Our own review of the record shows the district court had entered scheduling orders requiring disclosure regarding the substance of witness testimony. We are convinced the district court acted well within its discretion in limiting the doctors' testimony because of Johnson's failure to comply with the previously entered discovery schedule.

*Limitation of Expert Cross-examination*

Johnson next argues in very general terms that the district court erred by preventing her from cross-examining one of Miller's expert witnesses regarding that witness' medical license. Johnson claims this questioning would have been relevant to that witness' credibility. In denying a new trial on this basis, the district court specifically ruled this did not prejudicially affect Johnson and did not rise to the level of granting a new trial.

The first obvious problem with Johnson's argument is that it is not adequately briefed or argued. Johnson does not cite to the record on appeal where she entered her trial objection to demonstrate the issue was preserved, and she cites no legal authority supporting her argument. And Johnson does not address in any manner the district court's holding that no prejudice resulted from this claimed error. We find the two paragraphs of Johnson's brief inadequate to properly raise this issue on appeal. Claims made in passing without argument or citations to authority are deemed waived and abandoned. *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 714, 216 P.3d 170 (2009). We hold that Johnson has inadequately presented this issue on appeal for this court's consideration of it.

### *Questioning Miller about Johnson's Legal Pleadings*

Johnson does only slightly better than the previous issue at briefing her claim that Miller should not have been questioned about the impact on her of Johnson's general denial in the legal pleadings that medical malpractice had been committed. Johnson contends only generally that the evidence was irrelevant and "highly prejudicial," but she offers no caselaw support or deeper discussion as to how the admission of this testimony—in the context of the other evidence—adversely impacted the jury's outcome or denied Johnson a fair trial.

We note again that the district court specifically found no prejudice from the admission of this testimony, and Johnson's only contention to this court is the bald counter that the evidence was "highly prejudicial." Any effort to demonstrate prejudice would necessarily include consideration of the other evidence presented at trial and Johnson has not attempted to make this showing. This is insufficient to argue such an issue to this court. As with the previous claim, we hold Johnson has waived it.

Affirmed in part, reversed in part, and remanded with directions.

ROSEN, J., not participating.
KNUDSON, J., assigned.

❋ ❋ ❋

BEIER, J., concurring in part and dissenting in part: I agree with the majority's resolution of the nonconstitutional issues in this case. I also agree with the majority's determination that the statutory cap on noneconomic damages does not violate the doctrine of separation of powers. I would, however, reverse and remand to the district court because K.S.A. 60-19a02, as applied to plaintiff Amy C. Miller, violates the right to trial by jury of Section 5 and the right to remedy provision of Section 18 of the Kansas Constitution Bill of Rights. Given my certainty about these constitutional infir-

mities, I reserve judgment on the merit of Miller's equal protection challenge.

The majority's decision to uphold the cap flows from what I believe to be its misunderstanding and underperformance of this court's duty to police legislative infringement of Kansas citizens' constitutional rights. Although my colleagues are honest and hard-working judges for whom I have great respect, today we disagree.

On the jury trial issue, in particular, the majority apparently starts with what it views as a palatable result and works backward to articulate a substitute rationale for demonstrably infirm precedent. This approach is mystifying, as this court normally prides itself on doing exactly the opposite, following the law and logic to their natural conclusion. I see no reason to deviate from this practice in this case. Nor is there a reason for the majority to cling to analytical errors infecting certain of our precedents, at times inflating the support they can provide to its chosen outcome. It is more honorable to repair a wrong than to persist in it. Thomas Jefferson, The Batture at New Orleans (1812), in 18 The Writings of Thomas Jefferson 123 (Bergh, ed. 1907).

On the right to remedy issue, the majority correctly recognizes that we permit the legislature to abolish a common-law remedy protected by Section 18 as long as it provides an adequate substitute remedy reasonably necessary in the public interest to promote the general welfare of the people of the state. But, in my view, the majority fails to recognize the hollowness of the purported substitute here and neglects its responsibility to demand that even the illusory remedy be adequate. Indeed, its only adequacy discussion shifts its focus from the purported remedy on which it has relied to the amount of the cap. In short, the cap and the other legislation relied upon by the majority take from injured Kansans; these measures give nothing in return.

## HISTORY OF K.S.A. 60-19a02

Before I can discuss the reasons I depart from the majority, I pause to fill in its incomplete review of the relevant history behind the cap statute. The majority's more casual approach to context may partly enable what I see as its later analytical missteps.

In 1976, the legislature enacted a package of health-care-related reforms. The Health Care Provider Insurance Availability Act (HCPIAA) was the main component of those reforms. See K.S.A. 40-3401. It had three key features.

First, the Act demanded that all health care providers, as a condition to practice in Kansas, must carry professional liability insurance coverage of not less than $100,000 per occurrence with a $300,000 annual aggregate. K.S.A. 1976 Supp. 40-3402. Second, the Act created the Health Care Stabilization Fund (Fund), a state-run excess insurer, to provide coverage for judgments and settlements above the limits of a provider's primary coverage. K.S.A. 1976 Supp. 40-3403; see *Aves v. Shah*, 258 Kan. 506, 509, 906 P.2d 642 (1995). Third, the Act established the Joint Underwriting Association Plan, a high-risk insurance pool for those providers unable to obtain the required primary insurance on the private market. K.S.A. 1976 Supp. 40-3413; see *Aves*, 258 Kan. at 508-09.

These three provisions were supposed to work together toward the goal of "guaranteeing to all Kansas citizens that all health care providers in the state would have primary insurance coverage with at least a $100,000 policy limit plus unlimited excess malpractice insurance coverage." *Lemuz v. Fieser*, 261 Kan. 936, 951, 933 P.2d 134 (1997).

In addition to the HCPIAA, the 1976 legislation package included changes to tort litigation procedures in medical malpractice actions, among them: (1) elimination of corporate negligence claims against medical care facilities for granting/allowing staff privileges to a non-agent or non-employee physician, K.S.A. 1976 Supp. 65-442(b); (2) requirement of court approval for attorney fees in medical malpractice actions, K.S.A. 1976 Supp. 7-121b; (3) establishment of medical malpractice screening panels, K.S.A. 1976 Supp. 65-4901 *et seq.*; (4) allowance of evidence of collateral source benefits in medical malpractice cases, K.S.A. 60-471 (Weeks 1976); and (5) shortening of the statute of repose in medical malpractice actions from 10 years to 4 years, K.S.A. 60-513(c) (Weeks 1976).

By 1984, problems with the Fund prompted changes to the mandatory insurance provisions of the Act. As initially established, pro-

viders were to pay surcharges based on a percentage of their primary coverage premiums into the Fund to build its balance until it reached $10 million. That balance was reached by 1981, and thus no surcharges were levied on health care providers from 1981 to 1983. But the Fund's unlimited liability for excess coverage soon left it upside down, as more than $27 million in settlements and awards arose during the same time period. See *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 336, 757 P.2d 251 (1988).

The legislature addressed this problem by eliminating the $10 million limitation on the Fund's balance; by capping the Fund's liability at $3 million for any single judgment or settlement and at $6 million for the annual aggregate for any one provider; and by raising the mandatory primary coverage limits from $100,000 per occurrence/$300,000 annual aggregate to $200,000 per occurrence/$600,000 annual aggregate. See L. 1984, ch.178, sec. 1; ch. 238, secs. 2, 4; see also *Lemuz*, 261 Kan. at 951; *Kansas Malpractice Victims Coalition*, 243 Kan. at 336.

Meanwhile, medical liability insurers and health care providers continued to push for additional reform. They claimed that rising medical malpractice insurance premiums had created a problem of affordability which, if left unaddressed, would drive health care providers from their businesses, affecting the availability and delivery of health care services for Kansas citizens. Report on Kansas Legislative Interim Studies to the 1986 Legislature, pp. 858-59 (1985). In response to these claims, in 1986, the legislature enacted House Bill 2661. This legislative initiative, for the first time, included caps on damages available to medical malpractice plaintiffs. *Kansas Malpractice Victims Coalition*, 243 Kan. at 337.

The caps were set out in K.S.A. 1986 Supp. 60-3407. That statute imposed a $250,000 cap on noneconomic loss and a $1 million cap on total recovery. L. 1986, ch. 229, sec. 13; K.S.A. 1986 Supp. 60-3407. The noneconomic damages cap was designed to be adjusted annually for inflation. L. 1986, ch. 229, sec. 13(d). In addition, H.B. 2661 again adjusted certain procedures for medical malpractice actions. It instituted mandatory settlement conferences, L. 1986, ch. 229, sec. 18; it introduced restrictions on expert witness testimony on the standard of care, targeting "professional" expert wit-

nesses, L. 1986, ch. 229, sec. 17; and it required an evidentiary hearing before a court could approve attorney fees, L. 1986, ch. 229, sec. 22; see K.S.A. 7-121b. The legislation also further reduced the limits of the Fund's excess coverage from $3 million per claim/ $6 million annual aggregate to $1 million per claim/$3 million annual aggregate. K.S.A. 1986 Supp. 40-3403(f).

As H.B. 2661 worked its way through the legislative process, certain policy advocates began raising concerns that there was a crisis in liability insurance generally, not just in the medical malpractice area. The legislature responded to these concerns in 1987 by enacting a series of tort reforms. These included a $250,000 cap on pain and suffering damages in all personal injury actions other than medical malpractice. K.S.A. 1987 Supp. 60-19a01. Unlike the medical malpractice caps applicable to all noneconomic damages and to total awards, the personal injury cap applied only to pain and suffering, a subset of noneconomic damages. See *Kansas Malpractice Victims Coalition*, 243 Kan. at 337.

In July of 1987, this court decided *Farley v. Engelken*, 241 Kan. 663, 740 P.2d 1058 (1987), in which we held the statute allowing evidence of collateral source benefits in medical malpractice actions impermissibly singled out negligent health care providers "for preferential treatment not extended to any other tortfeasor, professional or otherwise" in violation of equal protection. *Farley*, 241 Kan. 663, Syl. ¶ 6.

Then, in January 1988, in *Kansas Malpractice Victims Coalition*, Shawnee County District Court Judge Franklin Theis declared the damages caps and certain annuity provisions of the 1986 malpractice legislation package, H.B. 2661, unconstitutional. Judge Theis ruled that these elements of the law violated the right to jury trial of Section 5 and the right to remedy provision of Section 18. An appeal of Judge Theis' decision was pending before this court during the 1988 legislative session.

The *Farley* decision and Judge Theis' ruling fostered a belief among health care providers and medical liability insurers that tort reforms must be applied to all personal injury actions to withstand constitutional challenge. Specifically, they feared that the medical malpractice caps at issue in the *Kansas Malpractice Victims Coa-*

*lition* appeal would be held to violate equal protection. They thus began a push to expand the medical malpractice provisions to all personal injury actions. See Testimony of Jerry Slaughter, House Judiciary Committee Minutes, February 8, 1988; Testimony of Tom Bell, Kansas Hospital Association, House Judiciary Committee Minutes, February 9, 1988; Testimony of Ron Smith, Kansas Bar Association, House Judiciary Committee Minutes, February 10, 1988.

The legislature responded by passing House Bill 2692, which amended K.S.A. 1987 Supp. 60-19a01 to make it applicable only to non-medical malpractice personal injury actions based on causes of action that accrued after July 1, 1987, and "before July 1, 1988." L. 1988, ch. 216, sec. 2. Section 3 of H.B. 2692 contained what would become K.S.A. 60-19a02, the statute at issue in this case. Its language remains unchanged through today:

"(a) As used in this section 'personal injury action' means any action seeking damages for personal injury or death.

"(b) In any personal injury action, the total amount recoverable by each party from all defendants for all claims for noneconomic loss shall not exceed a sum total of $250,000.

"(c) In every personal injury action, the verdict shall be itemized by the trier of fact to reflect the amount awarded for noneconomic loss.

"(d) If a personal injury action is tried to a jury, the court shall not instruct the jury on the limitations of this section. If the verdict results in an award for noneconomic loss which exceeds the limit of this section, the court shall enter judgment for $250,000 for all the party's claims for noneconomic loss. Such entry of judgment by the court shall occur after consideration of comparative negligence principles in K.S.A. 60-258a and amendments thereto.

"(e) The provisions of this section shall not be construed to repeal or modify the limitation provided by K.S.A. 60-1903 and amendments thereto in wrongful death actions.

"(f) The provisions of this section shall apply only to personal injury actions which are based on causes of action accruing on or after July 1, 1988."

By combining the two previous caps into one, the legislature made each more restrictive of potential jury awards. The cap that applied to personal injury actions now applied to all noneconomic damages, not merely the subset of pain and suffering. The cap on noneconomic damages in medical malpractice actions no longer included an inflation adjustment provision.

Shortly after K.S.A. 60-19a02 was enacted, this court issued its decision in *Kansas Malpractice Victims Coalition*, holding that the 1986 medical malpractice caps on noneconomic damages ($250,000) and total damages ($1 million) violated the right to jury trial under Section 5 and the right to remedy under Section 18. *Kansas Malpractice Victims Coalition*, 243 Kan. 333, Syl.

Later in 1988, a judge of the federal District of Kansas certified a question to this court on whether the 1987 cap on pain and suffering damages in non-medical malpractice personal injury actions violated the right to jury trial and right to remedy provisions of the Kansas Constitution. *Samsel v. Wheeler Transport Services, Inc.*, 244 Kan. 726, 771 P.2d 71 (1989) (*Samsel I*). This court issued a preliminary decision in the case, *Samsel I*, on March 30, 1989. The court rejected the constitutional challenges without articulating an analysis, stating only: "A majority of this court has determined that the answer to the certified question is no. Neither the original nor the amended version of [K.S.A.] 60-19a01 violates the Constitution of the State of Kansas." A "formal opinion expressing the views of the members of the court" was to be filed "when . . . prepared." *Samsel I*, 244 Kan. at 727. This highly unusual accelerated procedure was expressly driven by the issue's concurrent politicization, by "widespread interest and statewide effect of the court's determination of this question." *Samsel I*, 244 Kan. at 727. Justices Harold S. Herd and Donald L. Allegrucci were shown as dissenters. *Samsel I*, 244 Kan. at 727.

Having received an abbreviated blessing from this court, the legislature wasted no time in again lowering the Fund's liability limits. Under a May 1989 provision, providers would be free to choose one of three different levels of excess coverage. The minimum level would now be $100,000 per judgment with a $300,000 annual aggregate. L. 1989, ch. 143, sec. 3. The relevant substance of this provision has also remained exactly the same through today. See K.S.A. 40-3403(l)(1).

This court filed its formal opinion in *Samsel*, in March 1990. *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 789 P.2d 541 (*Samsel II*). Although the initial certified question was confined to K.S.A. 1987 Supp. 60-19a01—the cap on pain and suffer-

ing damages in non-medical malpractice actions that applied to plaintiff Douglas Samsel's cause of action arising out of his May 16, 1988, injury—*Samsel II* accepted the parties' invitation to rule upon 1988's K.S.A. 1988 Supp. 60-19a02 as well. The majority rejected Samsel's challenges to its constitutionality under Section 5 on jury trial and Section 18 on right to remedy. Justice Tyler Lockett, writing for the five-member majority, characterized the differences between 60-19a01 and 60-19a02 as minor and said that they gave "rise to no additional issues"; thus "no purpose would be served by requiring [a plaintiff in Samsel's position whose cause of action accrued after July 1, 1988,] to argue the same issues resolved in this case." 246 Kan. at 346-47.

## RIGHT TO TRIAL BY JURY

Section 5 of the Kansas Constitution Bill of Rights could not be simpler or more plain: "The right to trial by jury shall be inviolate."

This language preserves the right to jury trial in those causes of action that were triable to a jury under the common law extant in 1859, when the Kansas Constitution was ratified by the people of our state. *In re Rolfs*, 30 Kan. 758, 762, 1 P. 523 (1883); see *In re L.M.*, 286 Kan. 460, 476, 186 P.3d 164 (2008) (Luckert, J., concurring) ("[T]he uncompromising language of [Section 5] applies if an examination of history reveals there was a right at common law to a jury trial under the same circumstances."). Moreover, the right is more than a right to impanel a jury. It is a process that includes the right to assemble a jury, a right to present evidence, a right to have the jury determine and award damages, and the right to a judgment for the full damages as determined by the jury and supported by the evidence. See *Hasty v. Pierpont*, 146 Kan. 517, 520, 72 P.2d 69 (1937) (right to jury trial preserves substantive incidents of common-law jury trial, not "mere matters of form and procedure"); see also *Colgrove v. Battin*, 413 U.S. 149, 157 n.11, 93 S. Ct. 2448, 37 L. Ed. 2d 522 (1973) (substantive incidents of common-law jury trial include functions "regarded as fundamental, as inherent in and of the essence of the system of trial by jury") (quoting Scott, *Trial by Jury and the Reform of Civil Procedure*, 31 Harv. L. Rev. 669, 671 [March 1918]).

Today's majority has no quibble with the historical applicability of Section 5 to common-law tort actions and to medical malpractice actions in particular. Such matters were triable to a jury as a matter of right at common law when the Kansas Constitution was ratified, and thus Section 5 guarantees the parties the right to a jury trial in this case. See *Samsel II*, 246 Kan. at 358; *Kansas Malpractice Victims Coalition*, 243 Kan. at 342-43.

The majority also correctly concludes that the determination of noneconomic damages was a fundamental part of a jury trial at common law. This point is also well-settled. See *Smith v. Printup*, 254 Kan. 315, 324, 866 P.2d 985 (1993) ("There is no question in Kansas that the right to trial by jury includes the right to have a jury determine actual damages."); *Samsel II*, 246 Kan. at 350-52, 358 (under Kansas Constitution, common law, right to jury trial includes right to have jury determine economic, noneconomic damages); *Kansas Malpractice Victims Coalition*, 243 Kan. at 343 ("The jury's traditional role is to decide issues of fact. . . . The determination of damages is an issue of fact. Therefore, it is the jury's responsibility to determine damages."); accord *Watts v. Lester E. Cox Medical Centers*, 376 S.W.3d 633 (2012) (Missouri Constitution's "inviolate" right to jury trial includes right to have jury determine facts, including noneconomic damages).

It is after its agreement on these two irrefutable points that the majority first goes astray. The next question that must be answered is whether K.S.A. 60-19a02 *impairs* the right to jury trial by inter-fering with the jury's fundamental function in determining none-conomic damages. See *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 376, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996) (after determining applicability, court considers impairment; Seventh Amendment jury trial analysis asks whether "particular trial deci-sion must fall to the jury . . . to preserve the substance of the common law right as it existed" at ratification); 9 Wright & Miller, Federal Practice & Procedure: Civil § 2302.4 (3d ed. 2008) (anal-ysis of whether procedure violates Seventh Amendment "must look to whether that procedure obstructs or interferes with the jury's substantive role as the fact-finder"). Rather than stating in a

straightforward way that K.S.A. 60-19a02 does impair the Section 5 right to jury trial, the majority feints toward then-Justice Kay McFarland's position in her concurrence in *Samsel II* that the right to jury trial does not extend to the remedy phase of trial. *Samsel II*, 246 Kan. at 363 (McFarland, J., concurring). It does not, however, endorse this position. Rather, it merely announces summarily that it need not "engage these contentions for long," stating that the cap "encroaches" upon Section 5's jury trial right.

This "encroachment" holding should end the matter, and the cap should be struck down as unconstitutional. Although the majority does not define "encroachment" as impairment, I discern no analytical daylight between the two concepts, and the majority suggests none. The noneconomic damages cap "necessarily infringes" on the inviolate right to trial by jury in a medical malpractice action as the right existed at common law and was made constitutional in 1859. *Watts*, 2012 WL 3101657, at *6. "The individual right to trial by jury cannot 'remain inviolate' when an injured party is deprived of the jury's constitutionally assigned role of determining damages according to the particular facts of the case." *Watts*, 2012 WL 3101657, at *6. Giving the jury "a practically meaningless opportunity to assess damages simply 'pays lip service to the form of the jury but robs it of its function.' " *Watts*, 2012 WL 3101657, at *7 (quoting *Sofie v. Fibreboard Corp.*, 112 Wash. 2d 636, 655, 771 P.2d 711 [1989] [en banc]); see also *Atlanta Oculoplastic Surgery, P.C. v. Nestlehutt*, 286 Ga. 731, 735-36, 691 S.E.2d 218 (2010) (striking down damages cap for infringing state constitution's inviolate right to jury trial); *Lakin v. Senco Products, Inc.*, 329 Or. 62, 78-79, 987 P.2d 463, 473 (1999) (same); *Moore v. Mobile Infirmary Ass'n*, 592 So. 2d 156, 164 (Ala. 1991) (same); *Smith v. Department of Ins.*, 507 So. 2d 1080, 1089 (Fla. 1987) (same); *Arneson v. Olson*, 270 N.W.2d 125, 136 (N.D. 1978) (same).

The majority does not stop at this place, as it should, instead deciding that the legislature may "constitutionally obstruct" Kansans' right to jury trial if, in the court's judgment, the two-part due process-based quid pro quo test applicable to Section 18 analysis is satisfied. I believe the quid pro quo test to be a senseless and unsupported overlay that transforms what the people made invio-

late into something violable at will. My colleagues' insistence upon this step overlooks long-standing limitations on the legislature's power to modify the common law; overestimates the persuasive force of prior Kansas cases; and shortcuts the necessary cost-benefit evaluation. In the end, all of this means that sound analysis is sacrificed in favor of condescension toward the legislature.

These are marked flaws in the majority's approach, and I address each express error in the subsections below. But first I am compelled to point out three other problems arising from what the majority does *not* say. These problems mark dramatic departures from our usual patterns and practices in countless cases of many types. These more general criticisms spotlight errors in the majority's reasoning and decision that are at least as bad, if not worse, than its express and specific errors because of their tendency to undermine the overall predictability and stability in Kansas law that should always be among the paramount goals of this court.

*Three Problems*

First, the majority ignores the plain "inviolate" language chosen by Kansas citizens for Section 5's jury trial provision. Inviolate means not "disturbed or limited." *In re Rolfs*, 30 Kan. at 762. It is defined as " '[n]ot violated; unimpaired; unbroken; unprofaned.' " *Samsel II*, 246 Kan. at 368 (Herd, J., dissenting); see also *Watts*, 2012 WL 3101657, at *3 ("inviolate" means free from change or blemish, pure, unbroken) (citing Webster's Third New International Dictionary 1190 [1993]); *Sofie*, 112 Wash. 2d at 656 (citing same) ("inviolate" connotes deserving of highest protection, free from assault, trespass, untouched, intact). This inviolate right to jury trial is "a basic and fundamental feature of American jurisprudence." *Gard v. Sherwood Construction Co.*, 194 Kan. 541, 549, 400 P.2d 995 (1965); see also *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 340-41, 343, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979) (Rehnquist, J., dissenting) (right so important that denial of "right of jury trial was listed among the specific offensive English acts denounced in the Declaration of Independence"; right a "bulwark" of liberties, so essential that it " 'was probably the only one universally secured by the first American state constitutions' ") (quot-

ing Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History 281 [1960]).

The language of Section 5 is "uncompromising." *In re L.M.*, 286 Kan. at 476 (Luckert, J., concurring). Section 5 imposes a "clear, precise and definite limitation[] upon the powers of the legislature." *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.*, 31 Kan. 660, 665, 3 P. 284 (1884). It was chosen precisely because the people recognized that the right to jury trial required protection from legislative efforts to modify it in ways that destroy the substance of that right. See Wyandotte Const. Convention 462-63 (July 25, 1859) ("[T]hat very valuable right we propose to secure to the citizen in retaining the right of trial by jury, intact, will be accomplished by the words, 'The right of trial by jury shall be inviolate.' "); see also *State ex rel. v. City of Topeka*, 36 Kan. 76, 85-86, 12 P. 310 (1886) (by preserving the right as "inviolate," framers intended that the right of trial by jury "shall be and remain as ample and complete as it was at the time when the [C]onstitution was adopted").

This court's deliberately chosen and carefully cultivated habit, when doing comparatively lowly statutory interpretation intended only to discern the intent of the legislature and not the people, is to start with the text. See *Board of Leavenworth County Comm'rs v. Whitson*, 281 Kan. 678, 685, 132 P.3d 920, 926 (2006) ("[t]he most fundamental rule of statutory interpretation and construction, to which all other rules are subordinate, is that the intent of the legislature governs"; "the legislature is initially presumed to have expressed [its intent] through the language it used"); see also *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 331, 277 P.3d 1062 (2012); *Graham v. Dokter Trucking Group*, 284 Kan. 547, 554, 161 P.3d 695 (2007); *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 88, 106 P.3d 492 (2005). If the text is clear, we mightily resist going beyond it to arrive at an authoritative interpretation. See *Whitson*, 281 Kan. at 685 ("[a]n appellate court merely interprets the language as it appears; it is not free to speculate and cannot read into the statute language not readily found there"); see also *O'Brien*, 294 Kan. at 331; *Graham*, 284 Kan. at 554; *GT, Kansas, L.L.C. v. Riley County Register of Deeds*,

271 Kan. 311, 316, 22 P.3d 600 (2001). Even a learned Court of Appeals colleague has not persuaded us to do otherwise. See *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 326-35, 255 P.3d 1186 (2011) (Leben, J., concurring) (urging discernment of legislative intent by any means necessary rather than employment of strict textualism). This habit is the conservative choice. It respects the legislature's ability to say what it means about its public policy choices, conforming to its and our recognized institutional competencies. Should we not be at least as careful, at least as respectful when interpreting the people's document? And should that care and that respect not reach their zeniths when we examine that portion of the document, the Bill of Rights, specifically designed to make clear those individual freedoms that cannot be infringed by majoritarian government? It is virtually inconceivable that any of my colleagues in the majority would answer "no" to these questions. Their failure even to ask them is a mystery.

Second, the majority's decision to tighten prior courts' misguided embrace of the quid pro quo test in Section 5 jury trial examination—rather than kick it to the curb where it always belonged—demonstrates a completely uncharacteristic lack of curiosity about the guidance to be found in the experience of our sister states. Not one—not one—of the 19 states that have considered whether damages caps violate their state constitutional right to jury trial has given the quid pro quo test *any* role in the decision; this is true regardless of the particular wording of the state constitutional provision at issue and regardless of the ultimate outcome on the constitutional question. See *Moore*, 592 So. 2d at 159-65 (right to jury trial "inviolate"); *Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1050-51 (Alaska 2002) (right to jury trial "preserved"); *Smith*, 507 So. 2d at 1088-89 (right to jury trial "inviolate"); *Atlanta Oculoplastic Surgery P.C.*, 286 Ga. at 733 (right to jury trial "inviolate"); *Kirkland v. Blaine County Medical Center*, 314 Idaho 464, 466-69, 4 P.3d 1115 (2000) (right to jury trial "inviolate"); *Johnson v. St. Vincent Hospital*, 237 Ind. 374, 382-86, 404 N.E.2d 585 (1980) (right to jury trial "inviolate"), *overruled on other grounds In re Stephens*, 867 N.E.2d 148 (Ind. 2007); *Murphy v. Edmonds*, 325

Md. 342, 351 n.3, 601 A.2d 102 (1992) (right to jury trial "inviolably preserved"); *Zdrojewski v. Murphy*, 254 Mich. App. 50, 75-76, 657 N.W.2d 721 (2002) (right to jury trial "shall remain"); *Watts*, 2012 WL 3101657, at *6-7 (right to jury trial "inviolate"); *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 953, 663 N.W.2d 43 (2003) (right to jury trial "inviolate"); *Arneson*, 270 N.W.2d at 137 (right to jury trial "inviolate"); *Arbino v. Johnson & Johnson*, 116 Ohio St. 3d 468, 473-77, 880 N.E.2d 420 (2007) (right to jury trial "inviolate"); *Lakin*, 329 Or. at 73-79 (right to jury trial "inviolate"); *Matter of Certif. of Question of Law*, 544 N.W.2d 183, 202-03 (S.D. 1996) (right to jury trial "inviolate"); *Judd v. Drezga*, 103 P.3d 135, 144-45 (Utah 2004) (right to jury trial "inviolate" only in capital cases; right to jury trial guaranteed in civil cases); *Etheridge v. Medical Center Hospital*, 237 Va. 87, 376 S.E.2d 525 (1989) (jury trial "preferable," "sacred"); *Sofie*, 112 Wash. 2d at 642-67 (right to jury trial "inviolate"); *Robinson v. Charleston Area Med. Center*, 186 W. Va. 720, 730-31, 414 S.E.2d 877 (1991) (right to jury trial "preserved"); *Guzman v. St. Francis Hospital, Inc.*, 240 Wis. 2d 559, 573-78, 623 N.W.2d 776, 783-85 (Wis. App. 2000) (right to jury trial "inviolate"); *overruled on other grounds Ferdon v. Wisconsin Patients Comp. Fund*, 284 Wis. 2d 573, 701 N.W.2d 440 (2005). One has expressly rejected such an approach: The Oregon Supreme Court in *Lakin*. 329 Or. at 80-82.

*Lakin* involved a challenge to the constitutionality of a cap on noneconomic damages in personal injury actions. The defendant argued that the cap did not violate the plaintiff's right to jury trial because the plaintiff received a substantial recovery. *Lakin*, 329 Or. at 80 (citing *Hale v. Port of Portland*, 308 Or. 508, 523, 783 P.2d 506 [1989]) (state constitutional right to remedy provision not violated when legislature modifies, abolishes cause of action, as long as injured party left with some substantial remedy). The *Lakin* court held that the "substantial remedy" analysis was completely irrelevant to its consideration of the constitutional right to jury trial:

"We do not find *Hale's* [right to remedy analysis] relevant to our analysis of Article I, section 17. This court's Article I, section 17, jurisprudence never has established a 'substantial' remedy test in defining the scope and meaning of the right of jury trial. Moreover, we do not assess the constitutionality of [the cap] under Article

I, section 17, based on the amount of the statutory cap; rather we assess its constitutionality *because it is a cap* on the jury's determination of noneconomic damages." 329 Or. at 81.

The majority's apparent indifference to other jurisdictions' cases is remarkably atypical, as our cases consulting and considering the wisdom of other states are myriad. See, *e.g.*, *Gaumer v. Rossville Truck & Tractor Co.*, 292 Kan. 749, 758, 257 P.3d 292 (2011) (interpreting Kansas product liability statute, noting positions of sister states with similar product liability statutes); *In re K.M.H.*, 285 Kan. 53, 63, 169 P.3d 1025 (2007) (interpreting Kansas statute on presumptions of paternity, noting decisions by sister states regarding related statutes); *In re L.M.*, 286 Kan. at 471; see also Custer, *Citation Practices of the Kansas Supreme Court and Kansas Court of Appeals*, 8 Kan. J.L. & Pub. Pol'y 126, 127 (Spring 1999) (providing data on out-of-state citation by Kansas Supreme Court; noting Supreme Court cited to other states' opinions 14.4 percent in 1935, 5.8 percent in 1965, 13.9 percent in 1995).

This has been true, even when the issue before us has been one of state constitutional law. See *In re Care & Treatment of Ontiberos*, 295 Kan. 10, 24, 287 P.3d 855 (2012) (referring to Virginia Supreme Court's interpretation of Virginia Constitution); *State v. Sanchez-Loredo*, 294 Kan. 50, 58, 272 P.3d 34 (2012) (citing multiple cases from other jurisdictions interpreting their state constitutions under similar challenges); *In re K.M.H.*, 285 Kan. at 72-79 (discussing treatment of constitutional questions in several out-of-state cases with similar factual, legal issues); *Montoy v. State*, 279 Kan. 817, 826-28 112 P.3d 923 (2005) (same); *Canaan v. Bartee*, 276 Kan. 116, 131, 72 P.3d 911 (2003) (same); see also Baude, *Interstate Dialogue in State Constitutional Law*, 28 Rutgers L.J. 835, 838, 847-64, 852 (1997) (collecting "comprehensive" list of occasions on which state high courts refer to constitution of other states; suggesting Kansas Supreme Court decisions had, at time of article's publication, made at least 94 references to constitutions of other states including 9 references to Constitution of California; 6 references each to Kentucky and Ohio constitutions; 5 to Colorado and Florida; 4 to Alaska and Indiana; 3 references each to the constitutions of Arizona, Arkansas, Illinois, Iowa, Michigan, Mis-

souri, Oklahoma, Wisconsin; 2 references each to constitutions of Connecticut, Maryland, Massachusetts, Montana, Nebraska, New Jersey, New Mexico, Pennsylvania, South Carolina, Texas; 1 reference to constitutions of Delaware, Idaho, Louisiana, Minnesota, Nevada, New Hampshire, Tennessee, Utah, Virginia, West Virginia, and Wyoming); see generally Gardner, *Whose Constitution Is It? Why Federalism and Constitutional Positivism Don't Mix*, 46 Wm. & Mary L. Rev. 1245, 1263-64 (2005) ("American courts have a long tradition of consulting related rulings from other jurisdictions when analyzing issues arising under the law of their own jurisdictions[, even] in constitutional law despite the fact that the answers to constitutional questions are in principle to be found exclusively within the four corners of the relevant constitution."); Cauthen, *Horizontal Federalism in the New Judicial Federalism: A Preliminary Look at Citations*, 66 Alb. L. Rev. 783, 788, 790-94 (2003) (study of 13 state supreme courts' citation to other state supreme court decisions when interpreting state constitutional rights); see also *State v. Geisler*, 222 Conn. 672, 684-85, 610 A.2d 1225 (1992) (listing "sister state decisions" as "tool[] of analysis" for interpreting Connecticut constitution); *State v. Wheaton*, 121 Idaho 404, 408, 825 P.2d 501 (1992) (Bistline, J., concurring) (court receptive to reliance on sister state decisions in interpreting Idaho Constitution); *Davenport v. Garcia*, 834 S.W.2d 4, 20 (Tex. 1992) (encouraging citation to sister state constitutional decisions); *State v. Zaccaro*, 154 Vt. 83, 87, 574 A.2d 1256 (1990) (when interpreting Vermont Constitution, the court "may look for guidance to persuasive holdings . . . from . . . sister-state jurisdictions"). Again, the majority offers us no clue why it foregoes the usual practice its members have so routinely employed.

Third, and perhaps most revealing, my colleagues in today's majority make no mention of defense counsel's repeated statements during oral argument that the quid pro quo test does not apply to analysis of Section 5's right to jury trial. The majority's complete silence about this capitulation, its failure even to attempt to explain it away, is another mystery—especially given several members' near-total inflexibility when asked to consider issues and arguments not previously made or preserved by the parties. See *State v. Kelly*,

No. 102,210, filed September 28, 2012 (Nuss, C.J., dissenting, joined by Biles and Moritz, JJ.) (contemporaneous objection to evidence required, even in bench trial on stipulated facts designed only to preserve right to appeal suppression issue); *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010) (court has "consistently been refusing to review an evidentiary issue without a timely and specific objection even if the issue involves a fundamental right"); *State v. King*, 288 Kan. 333, 348-49, 204 P.3d 585 (2009) (legislature clearly intended K.S.A. 60-404 to require timely, specific objection in order to preserve evidentiary issues for appeal). I simply cannot fathom why today's majority elects to leave its ordinary path on preservation, at the same time not recognizing that when "neither party defends the reasoning of a precedent, the principle of adhering to that precedent through stare decisis is diminished." *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 363, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010).

Having addressed what is left out of the majority's decision, I turn to the substantial damage done by what it does discuss.

*Limitations on Modification of Common Law*

The majority's first expressed reason for applying the quid pro quo test to excuse K.S.A. 60-19a02's impairment of Kansans' right to jury trial is that the legislature can modify the common law. I do not dispute this general proposition. In certain circumstances, the legislature may modify the common law, although the practice was initially viewed with enough skepticism that it gave rise to a well-known canon of construction holding that statutes in derogation of the common law should be strictly construed. See Popkin, Materials on Legislation—Political Language and the Political Process 65-67, 74-75 (4th ed. 2005). What the majority fails to appreciate is that what may have been a mere common-law right to jury trial on the day before ratification of Section 5 was no longer a mere common-law right from ratification onward. Ratification expressed the people's choice to elevate the common-law right to jury trial to enumerated constitutional status. That status put it beyond everyday legislative meddling. The people entrusted juries with the task of deciding damages. The legislature's unwillingness

to do so—because it has been persuaded by one side with a dog in the fight—requires endorsement by the people before it can enjoy the force of law.

The critical distinction between common and constitutional law is hornbook material, as the United States Supreme Court emphasized long ago in *Dimick v. Schiedt*, 293 U.S. 474, 487, 55 S. Ct. 296, 79 L. Ed. 603 (1935):

> "It is said that the common law is susceptible of growth and adaptation to new circumstances and situations, and that the courts have power to declare and effectuate what is the present rule in respect of a given subject without regard to the old rule; and some attempt is made to apply that principle here. The common law is not immutable, but flexible, and upon its own principles adapts itself to varying conditions. [Citation omitted.] But here we are dealing with a constitutional provision which has in effect adopted the rules of the common law in respect of trial by jury as these rules existed in 1791. To effectuate any change in these rules is not to deal with the common law, qua common law, but to alter the Constitution. The distinction is fundamental, and has been clearly pointed out by Judge Cooley in 1 Const. Limitations (8th Ed.) 124."

See also *Watts*, 2012 WL 3101657, at *8 (allowing legislature to modify constitutional rights makes protections "of only theoretical value . . . [s]uch rights would not be rights at all but merely privileges that could be withdrawn"); *Atlanta Oculoplastic Surgery, P.C.*, 286 Ga. at 735 (general legislative authority to modify common law does not permit abrogation of constitutional rights); *Sofie*, 112 Wash. 2d at 652-54.

Justice Herd made the same point in his dissent in *Samsel II*:

> "Giving the legislature the authority to limit damages by changing the common law, or otherwise, violates § 5 of the Kansas Bill of Rights by taking the damage question away from the jury. A written constitution is adopted for the purpose of limiting the power of government. Providing that trial by jury shall be inviolate is a limitation on government as a protection of individual rights. There is no question the legislature has the power to change or abolish the common law. That, however, does not change the Kansas Constitution. A later change in the common law does not affect the meaning of § 5. Its meaning was fixed in 1859. The proper method of constitutional change is by amendment, not legislation." 246 Kan. at 369-70 (Herd, J., dissenting).

Even the case that is generally considered the source of recognition of legislative power to modify common law, *Munn v. Illinois*,

94 U.S. 113, 134, 24 L. Ed. 77 (1876), is explicit about constitutional limitations on the power: "Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations." See also *In re Tax Appeal of ANR Pipeline Co.*, 276 Kan. 702, 725, 79 P.3d 751 (2003) (Kansas Constitution limits otherwise plenary power of legislature); *Harris v. Shanahan*, 192 Kan. 183, 207, 387 P.2d 771 (1963) ("It is axiomatic that [any] act of the legislature[] is subject to the limitations contained in the Constitution, and where such act exceeds the bounds of authority vested in the legislature and violates the limitations of the Constitution, it is null and void and it is the duty of courts to so declare."); *Lemons v. Noller*, 144 Kan. 813, 817, 63 P.2d 177 (1936) (citing *State v. Weiss*, 84 Kan. 165, 168, 113 P. 388 [1911]; *Ratcliff v. Stock-yards Co.*, 74 Kan. 1, 16, 86 P. 150 [1906]) (legislature free to act except where Kansas Constitution restricts).

Today's majority violates the basic rule of these cases. This violation compounds earlier error in *Kansas Malpractice Victims Coalition* and *Samsel II*, as well as *Manzanares v. Bell*, 214 Kan. 589, 522 P.2d 1291 (1974) (examining constitutionality of no-fault automobile insurance legislation), by focusing on what the legislature *can* do rather than on what it *cannot*. I further discuss the weakness of the majority's stare decisis argument in the next subsection.

*The Weakness of Precedent*

The majority invokes stare decisis to further support its application of the quid pro quo test to save K.S.A. 60-19a02 from violation of plaintiff Miller's Section 5 jury trial right. It cites *Rhoten v. Dickson*, 290 Kan. 92, 112, 223 P.3d 786 (2010), for the general principle that a "court of last resort will follow the rule of law it established in its earlier cases unless clearly convinced the rule was originally erroneous or is no longer sound because of changing conditions and more good than harm will come by departing from precedent." 290 Kan. at 112.

I agree that *Rhoten* lays out the governing rule and its recognized exceptions, but I emphasize that it excuses us from following prec-

edent that is "plainly and unmistakably the result of mistake and error." *Prowant, Administratrix v. Kings-X*, 184 Kan. 413, 416-17, 337 P.2d 1021 (Jackson, J., dissenting), *rev'd on rehearing*, 185 Kan. 602, 347 P.2d 254 (1959); see also *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) (quoting *Lawrence v. Texas*, 539 U.S. 558, 577, 123 S. Ct. 2472, 156 L. Ed. 2d 508 [2003]) (Stare decisis does not require adherence to "a past decision when its rationale no longer withstands 'careful analysis.' "); *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 610, 214 P.3d 676 (2009) ("This court is not inexorably bound by precedent; it will reject rules that were originally erroneous or are no longer sound."). When faced with such a "mistake and error," *Rhoten* demands only that we also assess the costs and benefits of a decision to abandon an erroneous precedent, requiring the benefits to outweigh the costs.

We have also recognized that stare decisis is at its weakest in constitutional cases because our mistakes cannot be easily corrected by ordinary legislation. *State v. Hoeck*, 284 Kan. 441, 463, 163 P.3d 252 (2007); see also *Agostini v. Felton*, 521 U.S. 203, 235-36, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997) (erroneous court interpretations in such cases "can be altered only by constitutional amendment or by overruling our prior decisions"); *Watts*, 2012 WL 3101657, at *10 (quoting *Mountain Grove Bank v. Douglas County*, 146 Mo. 42, 54, 47 S.W. 944 [Mo. 1898]) (if people disagree with court interpretation of constitution, opportunity to change organic law more remote than opportunity to repeal, alter statute; "[m]oreover, no set of judges ought to have the right to tie the hands of their successors on constitutional questions, any more than one [set of legislators] should those of its successors on legislative matters"). And the principle of stare decisis is weaker still when the prior decision involved an erroneous "application of a constitutional principle rather than an interpretation of the Constitution to extract the principle itself." *Smith v. Allwright*, 321 U.S. 649, 665-66, 64 S. Ct. 757, 88 L. Ed. 987 (1944).

Finally, the majority also overlooks another consideration mitigating strict application of stare decisis in constitutional cases: Our allegiance must be to the Constitution itself, "not what we have

said about it." *Graves v. N.Y. ex rel. O'Keefe*, 306 U.S. 466, 491-92, 59 S. Ct. 595, 83 L. Ed. 927 (1939) (Frankfurter, J., concurring); see also *Harris v. Anderson*, 194 Kan. 302, 314, 400 P.2d 25 (1965) (Fatzer, J., dissenting) (quoting 3 Warren, The Supreme Court in United States History, p. 470: " 'However the court may interpret the provisions of the Constitution, it is still the Constitution which is the law and not the decision of the court. "To the decision of an underlying question of constitutional law no . . . finality attaches. To endure, it must be right." ' ").

The majority relies on *Kansas Malpractice Victims Coalition* and *Samsel II*, both of which applied the quid pro quo test to excuse impairment of the right to jury trial. *Samsel II*, 246 Kan. at 358, 362; *Kansas Malpractice Victims Coalition*, 243 Kan. at 344-52. *Samsel II* followed *Kansas Malpractice Victims Coalition* on this point, *Samsel II*, 246 Kan. at 351-62; and *Kansas Malpractice Victims Coalition*, in turn, relied on *Manzanares*, saying that *Manzanares* "found, in substance, that the injured person entitled to benefits under the statute received a sufficient quid pro quo for the limitation placed on his right to a jury trial." *Kansas Malpractice Victims Coalition*, 243 Kan. at 344. In none of these three cases, however, did this court see fit to explain how or why the quid pro quo test, a due process-based rule originally relating to whether legislation impairs a vested right, can excuse legislation's impairment of a constitutional right to jury trial.

Moreover, it appears that the initial reliance *Kansas Malpractice Victims Coalition* placed on *Manzanares* in order to apply quid pro quo arose out of a misreading. Nowhere in *Manzanares'* one-paragraph discussion of the right to jury trial claim before it did this court "require that the legislature provide an adequate substitute of the right to trial by jury[.]" Note, *Testing the Constitutionality of Tort Reform with a Quid Pro Quo Analysis: Is Kansas' Judicial Approach an Adequate Substitute for a More Traditional Constitutional Requirement?*, 31 Washburn L.J. 314, 332 (1992).

Today's majority, perhaps feeling the *Manzanares* sand shift beneath its feet, attempts to bolster its position by reaching still farther back to *Shade v. Cement Co.*, 93 Kan. 257, 144 P. 249 (1914), for support.

*Shade* involved multiple constitutional challenges to the original workers compensation law. The claims were based on federal due process and equal protection, and on the Kansas Constitution Bill of Rights' Section 5 right to jury trial and Section 18 right to remedy. *Shade*, 93 Kan. at 258-59. *Shade*'s notable pithy rationale for rejecting these claims lumps the state constitutional theories together; and the only thing it makes clear is the determinative weight given to the elective nature of the original workers compensation system.

"The objection based upon the supposed deprivation of a right of trial by jury is equally untenable, as determined in many adjudicated cases. The same is true of the arbitration feature and the rules for determining compensation. Without reviewing *seriatim* all the specific objections made to this statute under the general charge that it violates constitutional safeguards, it is sufficient to say that they have all been met in judicial decisions in other jurisdictions after the most thorough and patient examination. . . . Briefly, it may be said that the operation of the system of compensation provided by the statute rests upon the free consent of employer and employee, given in the manner provided by the act. Without such consent on his part the employee retains all his remedies under common and statutory law. It is a matter of election." 93 Kan. at 260 (citing *Matheson v. Minneapolis St. Ry. Co.*, 148 N.W. 71 [Minn. 1914] [election to be subject to system constitutes waiver of jury trial]; *Deibeikis v. Link-Belt Co.*, 261 Ill. 454, 104 N.E. 211 [1914] [same]).

In my view, today's majority takes this passage in *Shade* and stretches it well beyond its breaking point, contending it applied the quid pro quo test to reject the Section 5 challenge. This is inaccurate, as we have previously recognized in multiple cases. See *Baker v. St. Louis Smelting & Refining Co.*, 145 Kan. 273, 279, 65 P.2d 284 (1937) (quoting *Shade*, 93 Kan. at 259-60; emphasizing workers compensation system " 'rests upon the free consent of the employer and employee' "; thus "the liability of an employer to his employee under the act is a liability arising on contract"); *Potocan v. Hamilton Coal & Mercantile Co.*, 120 Kan. 326, 329, 243 P. 537 (1926) (citing *Shade*, 93 Kan. 257, for proposition workers compensation act subject to no constitutional infirmity because not compulsory); *Smith v. Packing Co.*, 115 Kan. 874, 875, 225 P. 110 (1924) (citing *Shade*, 93 Kan. at 260; "[Q]uestions as to whether various features of a workmen's compensation act were violative of

the Fourteenth Amendment have frequently been disposed of by reference to the fact that its application was made optional.").

Our Court of Appeals, the United States Supreme Court, the Missouri appellate courts, and commentators also would be surprised by what today's majority professes to find in *Shade*. See *Boyd v. Barton Transfer & Storage*, 2 Kan. App. 2d 425, 429, 580 P.2d 1366 (1978) (in first case to consider *Shade* since workers compensation system made mandatory, court cites *Shade* among cases upholding earlier system "against constitutional challenges on the ground that it was optional with the employer and employee"); *Middleton v. Texas Power & Light Co.*, 249 U.S. 152, 160, 395 S. Ct. 227, 63 L. Ed. 527 (1919) (citing *Shade* for upholding act because voluntary); *Mosely v. Empire Gas & Fuel Co.*, 313 Mo. 225, 233-34, 281 S.W. 762 (1926) (same); *Harbis v. Cudahy Packing Co.*, 211 Mo. App. 188, 191, 241 S.W. 960 (1921) (quoting *Shade*, 93 Kan. at 260; observing "Kansas courts have held that the relation between employer and employee" under workers compensation law "is contractual"); Phillips, *The Constitutional Right to a Remedy*, 78 N.Y.U. L. Rev. 1309, 1330 n.92 (2003) (citing *Shade*, 93 Kan. 257; "Decisions to uphold the statutes frequently were based on the fact that the employee or employer, or both, had the ability to opt out of the scheme."); Comment, *Workers' Compensation Benefits Go From Bad to Worse: The Kansas Supreme Court Eliminates the Parallel Injury Rule*, 48 Washburn L.J. 705, 710 n.42 (2009) (describing *Shade* as upholding original workers compensation law on ground that employers, employees consented to coverage).

Even weaker is the majority's assertion that *Rajala v. Doresky*, 233 Kan. 440, 661 P.2d 1251 (1983), "explicitly" applied the quid pro quo test in considering a right to jury trial challenge. The only issue in *Rajala* was whether the workers compensation law's abrogation of fellow-employee liability violated the Section 18 right to remedy provision. *Rajala*, 233 Kan. at 441-42. Likewise, the majority's citation of *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 942 P.2d 591 (1997), and *Scott v. Hughes*, 294 Kan. 403, 275 P.3d 890 (2012), for their discussion of the exchanges of rights and remedies between employers and employees inherent in the

Kansas workers compensation scheme cannot help it. These cases did not have anything to do with a jury trial challenge to the scheme. Thus neither suggests, let alone stands for, the proposition that the quid pro quo test can be applied to rescue a statute from its violation of Section 5.

To summarize, none of the cases the majority forwards as controlling precedent for using the quid pro quo test to excuse K.S.A. 60-19a02's impairment of plaintiff Miller's right to jury trial withstands examination. *Manzanares, Kansas Malpractice Victims Coalition*, and *Samsel II* give no explanation, much less an analytically sound one, of why the due process-based concept should be imported from Section 18. Furthermore, the majority's efforts to press *Shade* and *Rajala* into service as substitutes for *Manzanares, Kansas Malpractice Victims Coalition*, and *Samsel II* are singularly unconvincing. *Shade* relied on an entirely different rationale to reject the jury trial and the other state constitutional challenge to the original workers compensation system before the court. *Rajala* did not involve any jury trial challenge at all. Under these circumstances, I can say I am clearly convinced that the majority's application of the quid pro quo test to Section 5 was originally erroneous and remains so.

I now move to my criticism of the majority's conclusion that we must nevertheless maintain this erroneous rule because of our inability to cope with the consequence of its abandonment.

## Cost-benefit Examination

Yet another weakness in the majority's decision is its failure to engage in the comprehensive cost-benefit examination that *Rhoten* requires as the final step when we contemplate whether to keep or to jettison originally erroneous precedent. See *Rhoten*, 290 Kan. at 112. The parade of horribles it trots out, apparently as costs, is insubstantial and unconvincing, and the majority does not account properly for significant benefits.

Leading the parade of horribles is the majority's assertion that overruling our past application of the quid pro quo test to excuse violation of the right to jury trial would require dismantling of the workers compensation and no-fault automobile insurance systems.

See *Rajala,* 233 Kan. at 440 (workers compensation); *Manzanares,* 214 Kan. at 589 (no-fault). I do not believe this is true for several reasons.

First, as discussed above, *Rajala* was a Section 18 decision that did not address the right to jury trial in any way. See *Rajala,* 233 Kan. at 441. Nothing about refusal to apply the quid pro quo test to save a statute impairing the right to jury trial has any bearing on *Rajala*'s Section 18 holding.

Second, the comprehensive workers compensation system at issue in *Rajala* is totally distinct from the noneconomic damages cap applied to reduce plaintiff Miller's damages in this case. Miller's common-law cause of action for medical malpractice as it existed in 1859 was not wholly replaced with a comprehensive statutory scheme of compensation not employing jury trials at all. Far from it. Miller and all personal injury plaintiffs in Kansas are still required to file civil lawsuits; conduct necessary discovery; obtain required expert testimony; and prove negligence, causation, and damages to a jury by a preponderance of the evidence. The only thing changed by K.S.A. 60-19a02 is whether the district court judge can give effect to the jury's discharge of its constitutional assignment. In the workers compensation arena, although recoveries are fixed, they are directly proportional to the nature and extent of each claimant's injury and income. In addition, distinct Section 18 jurisprudence permitted wholesale abolition and replacement of a common-law cause of action because both sides received clear and comparable benefits from the legislative transaction. The new administrative system of no-fault compensation for injured workers left no common-law cause of action upon which Section 5's jury trial right could act. See *Watts,* 2012 WL 3101657, at *7 (constitutional right to jury trial contingent upon existence of civil action for damages). The cap at issue in this action did nothing of the sort, and its rejection on Section 5 grounds would not cause the collapse of the workers compensation system, much less make it inevitable or imminent.

Much of the same can be said of the no-fault automobile insurance system. It is markedly distinct from the damages cap at issue here. In order to receive prompt personal injury protection pay-

ments after a car accident, an injured person no longer needs to file a lawsuit to prove another's fault and the causal relationship between that fault and damages. Rather, the personal injury protection claimant simply submits a claim to the insurance company. The third-party common-law cause of action for those suffering relatively minor injury was replaced with a first-party insurance contract claim. As with workers compensation, the no-fault automobile insurance system means that every claimant's opportunity to recover is directly proportional to the seriousness of his or her case.

In short, all of the performers in the parade labor under a fallacy of relevance.

On the benefit side, the majority claims that following *Kansas Malpractice Victims Coalition* and *Samsel II* by applying the quid pro quo test to rescue K.S.A. 60-19a02 from invalidity under Section 5 fosters certainty. In fact, it does exactly the opposite.

Uncertainty is created when error is compounded by blind adherence to precedent that is analytically unsound. Certainty, predictability, stability, and respect for the rule of law are enhanced when this court does what it has otherwise insisted upon doing in every other case calling a legislative act into constitutional question. This is what every Kansan expects of us, and properly so. "We do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision." *Johnson Controls, Inc. v. Employers Ins. of Wausau*, 264 Wis. 2d 60, 121, 665 N.W.2d 257 (2003). That is why "[i]t is more important that the court should be right upon later and more elaborate consideration of the cases than consistent with previous declarations." *Barden v. Northern Pacific Railroad*, 154 U.S. 288, 322, 14 S. Ct. 1030, 38 L. Ed. 992 (1894); see also *Watts*, 2012 WL 3101657, at *10 ("[d]eviations from clear constitutional commands—although longstanding—do not promote respect for the rule of law") (quoting *Independence-Nat. v. Independence School*, 223 S.W.3d 131, 137 [Mo. 2007]).

The majority's final move in support of its application of the quid pro quo test to plaintiff Miller's jury trial challenge is its declaration that it simply "seems logical" and "makes sense" to forgive im-

pairment of the inviolate individual right to jury trial under the same standard that governs Section 18 right to remedy.

In fact, there is no logic or common sense to support this aspect of the majority's opinion. The Section 5 right to jury trial is distinct in every conceivable dimension from the Section 18 due process-based right to remedy. They share no language; the majority points to no shared drafting rationale. Indeed, the rights' placement in separate sections of the Bill of Rights makes it clear that they articulate different concepts aimed to achieve different purposes, and thus merit unique analyses. The majority cites not a single case in which this court or any other has *ever* excused violation of one obviously nonidentical constitutional right because the statute in question did not happen to violate another constitutional right. It has not done so because there are no such cases.

Why does the majority depart so radically from its usual patterns of analysis? One reason appears to be its doubt that legislators can comprehend anything more complicated. It states: "[T]he quid pro quo model readily allows the legislature to understand that it must provide an adequate and viable substitute when modifying a common-law jury trial right under Section 5 or right to remedy under Section 18." This is mere condescension. I am willing to trust that legislators (and the Kansans they represent) can understand that Bill of Rights provisions with different language placed by the people in different sections of our Constitution are interpreted and applied differently.

*Conclusion*

As a court of last resort, we are "the sole arbiter of the question whether an act of the legislature is invalid under the Constitution of Kansas. However delicate that duty may be, we are not at liberty to surrender, or to ignore, or to waive it. [Citation omitted.]" *Harris*, 192 Kan. at 207. We must therefore be especially careful not to extend a doubtful precedent where the result is to "to weaken or subvert" a fundamental constitutional right, *Dimick v. Schiedt*, 293 U.S. 474, 485, 55 S. Ct. 296, 79 L. Ed. 603 (1935), and cannot hide behind stare decisis to abdicate "our duty to reconsider constitutional interpretations that 'depar[t] from a proper understand-

ing' of the Constitution. [Citations omitted.]" *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 954, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (Rehnquist, J., concurring in judgment in part and dissenting in part). Our allegiance is always to the Constitution itself, not to our caselaw. As the Missouri Supreme Court did recently in its *Watts* case, we should demonstrate that allegiance by admitting the error in our precedent applying the quid pro quo test to a Section 5 jury trial challenge. See *Watts*, 2012 WL 3101657, at *11 (overruling *Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 [Mo. 1992]; striking down damages cap for violating right to jury trial). I therefore dissent from the majority's decision upholding K.S.A. 60-19a02 under Section 5. The statute's cap on noneconomic damages violates plaintiff Miller's right to jury trial. Even if I accepted that Section 18's quid pro quo test is met, which, as discussed in the next section, I do not, the test cannot excuse impairment of this inviolate, individual constitutional right.

### RIGHT TO REMEDY

The majority holds that the K.S.A. 60-19a02 cap on noneconomic damages does not violate the right to remedy provision of Section 18 because it survives the two-part quid pro quo test. Although I agree that the quid pro quo test applies to Section 18 claims, I disagree that the test is met in this case. I also would invalidate the cap under Section 18.

Under the quid pro quo test, if a statute abolishes or restricts a remedy protected by Section 18, it is unconstitutional unless (1) the modification was reasonably necessary in the public interest to promote the general welfare of the people of the state; and (2) the legislature has provided an adequate substitute remedy for the right that has been abolished or limited. *Lemuz v. Fieser*, 261 Kan. 936, 946-47, 933 P.2d 134 (1997); *Bonin v. Vannaman*, 261 Kan. 199, 217, 929 P.2d 754 (1996).

I agree with the majority's rejection of the defense argument that *Samsel II*'s "fictitious" quid pro quo—the statute's purely imaginary restriction of district court judges' power to reduce a noneconomic damages award greater than $250,000 to less than

$250,000—controls. See *Samsel II*, 246 Kan. at 367 (Herd, J., dissenting). A fresh look at the quid pro quo test is required.

That fresh look begins with the threshold question: Does the cap impair a remedy protected by Section 18? The majority admits early that Section 18 is designed to ensure an injured plaintiff is made "whole." See PIK Civ. 4th 171.02 (jury instructed to establish noneconomic damages at "amount that will fairly and adequately compensate the plaintiff"). But for reasons undisclosed, the majority is squeamish about declaring that the cap impairs the right to remedy. Instead, it says the cap "is subject to Section 18's protections" and that it "implicate[s] the right secured by Section 18," burying the lede by placing it in a parenthetical appended to a *Kansas Malpractice Victims Coalition* citation. I would start with a clear statement that the right to remedy is infringed by the cap on noneconomic loss. See *Kansas Malpractice Victims Coalition*, 243 Kan. at 350.

Having established the answer to the threshold question, I agree that we must move to the first part of the quid pro quo test, which demands that the cap be reasonably necessary in the public interest to promote the general welfare of the people of the state. This poses an obstacle similar, if not identical, to the rational basis standard familiar from equal protection analysis. *Injured Workers of Kansas*, 262 Kan. at 881 (quoting *Lemuz*, 261 Kan. at 948); *Bonin*, 261 Kan. at 218 (same). Rational basis imposes " 'two substantive limitations on legislative choice: legislative enactments must implicate legitimate goals, and the means chosen by the legislature must bear a rational relationship to those goals.' " *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 775, 830 P.2d 41 (1992) (quoting *Lyng v. Automobile Workers*, 485 U.S. 360, 375, 108 S. Ct. 1184, 99 L. Ed. 2d 380 [1988] [Marshall, J., dissenting]).

The plaintiff and her supporters have argued that the first part of the quid pro quo test cannot be met, because the medical malpractice insurance and liability insurance "crises" that eventually gave rise to the cap at issue here were nonexistent. For purposes of the extremely forgiving rational basis analysis of plaintiff Miller's as-applied challenge, any conceivable rational basis is sufficient. If the legislature's goal is worthy, as certainly access to affordable

malpractice insurance and health care undoubtedly is, then merely a logical possibility that the legislature's action will help to achieve the goal is enough. See, *e.g.*, *Barrett v. U.S.D. No. 259*, 272 Kan. 250, 256-57, 32 P.3d 1156 (2001) (application of recreational use exception under Kansas Torts Claims Act to coaching negligence cases in public schools passes rational basis test; distinguishing between injuries occurring on public versus nonpublic recreational property reasonably advances legitimate goal of encouraging development of public recreational property); *Chiles v. State*, 254 Kan. 888, 869 P.2d 707 (1994) (limited retroactivity provision of Sentencing Guidelines Act, distinguishing inmates convicted of more serious offenses from those with less serious convictions, rationally related to legitimate objective of reducing prison population, maintaining public safety); see also *State ex rel. Tomasic v. Unified Gov't of Wyandotte County/Kansas City*, 265 Kan. 779, 791-93, 962 P.2d 543 (1998) (inclusion of auto racetrack facility in definition of "major tourism area" bears rational relationship to furtherance of economic development of the state). The provisions of the HCPIAA, as amended, assert at least some control over malpractice insurance rates, and may encourage certain health care providers to settle or remain in Kansas. I therefore agree with the majority that the first part of the quid pro quo test is met in this case. But see *Ferdon v. Wisconsin Patients Comp. Fund*, 284 Wis. 2d 573, 629-30, 701 N.W.2d 440 (2005) (after 10 years' experience, holding cap violates equal protection because rational basis touted by proponents unsupported); *Plank v. Community Hospitals of Indiana, Inc.*, 956 N.E.2d 731, 736-37 (Ind. App. 2011) (case remanded to trial court to allow plaintiff evidentiary hearing on whether cap still bears rational relationship to legitimate government interest) vacated on transfer to Indiana Supreme Court, 963 N.E.2d 1120 (Ind. 2012).

I cannot likewise join the majority's further holding on the second step of the quid pro quo test. K.S.A. 60-19a02 and other malpractice law reforms did not provide an adequate substitute remedy for the cap's modification of plaintiff Miller's right to remedy under Section 18.

I begin with the question plaintiff Miller has squarely raised: Can the adequate substitute remedy requirement be satisfied with benefits that accrue to society in general or must there be an individual quid, *i.e.*, a direct benefit to each person in the class forced to surrender a remedy? Again, I do not see a clear answer to this question in the majority's opinion. I would provide one today, because our earlier caselaw on this point has been inconsistent.

Many of our precedents suggest that a substitute remedy must provide a direct benefit to individuals. See, *e.g.*, *Injured Workers of Kansas*, 262 Kan. at 883 ("when the legislature abolished the employees' common-law right to sue employers for injuries, the legislature provided employees with an adequate substitute remedy"); *Samsel II*, 246 Kan. at 358-62 (describing substitute remedy as "quid pro quo to the individual"); *Manzanares*, 214 Kan. at 596-97, 599-600 (mandatory first-party insurance benefits providing motor vehicle accident victim with system of "prompt, efficient payment" of medical expenses, lost wages, other economic losses without proof of fault constitutes adequate exchange for impairment of Section 18 remedy); *Hanson v. Krehbiel*, 68 Kan. 670, Syl. ¶¶ 1, 3, 674, 75 P. 1041 (1904) (right to remedy affords "one injured in his reputation . . . opportunity to show the extent of his injury"; statute specifying reparation "the same in all cases," bearing "no relation to the injury suffered," insufficient).

In contrast to the language used in these cases, our decision in *Lemuz* relied on a combination of individual and societal benefits to hold that there was an adequate substitute remedy. 261 Kan. at 959. We said that the plaintiffs would "personally receive the benefit" of the mandatory primary medical malpractice insurance and guaranteed excess coverage and "[f]urther, all plaintiffs will generally receive the benefit of the supplemental quid pro quo—risk management requirements that protect patients from incompetent doctors." 261 Kan. at 959. And, in *Bonin* we relied solely on the societal benefit of health care access to hold that the substitute remedy was adequate. 261 Kan. at 219.

I would hold today that an adequate substitute remedy is one that provides an individual benefit to each person in the class of plaintiffs whose constitutional right to remedy is impaired. Section

18 protects an individual right—the right of every person to the remedies that existed at common law for injuries to his or her person, property, or reputation. See *Noel v. Menninger Foundation*, 175 Kan. 751, 763, 267 P.2d 934 (1954) (Section 18 guarantees "every person a remedy by due course of law for injury done him in person or property.").

The requirement of an individual quid also is imperative because the first step of the Section 18 quid pro quo test focuses only on the public necessity for the legislation. Standing alone, it provides no protection for the individual right at stake. It is only the second step of the test that ensures the right to remedy cannot be "wholly sacrificed to the popular will." Note, *Restrictive Medical Malpractice Compensation Schemes: A Constitutional "Quid Pro Quo" Analysis to Safeguard Individual Liberties*, 18 Harv. J. on Legis. 143, 201 (1981); see also *Bair v. Peck*, 248 Kan. 824, 845, 811 P.2d 1176 (1991) (Herd, J., dissenting) (if requirement of substitute remedy ignored, "[o]ur written constitution loses its meaning and affords no barrier to the enactment of unjust laws resulting from transitory public pressures of the moment"). If some amorphous or even illusory public good is enough to satisfy the second step, then it effectively dissolves into the first. Retention of the distinct vitality of both the "minimum rationality" step and the adequate substitute step balances the legislature's freedom to modify "common-law tort remedies to accommodate the exigencies of contemporary society" and "meaningful protection" for the individual's right to remedy. 18 Harv. J. on Legis. at 200-01.

We implicitly recognized this necessity in *Lemuz*, when we held that the adequate substitute remedy requirement imposes an additional and more stringent limitation than rational basis. 261 Kan. at 948; see also *Kansas Malpractice Victims Coalition*, 243 Kan. at 350 (rejecting argument that "removal of a remedy can be justified any time by public need"); Comment, *The Kansas Remedy by Due Course of Law Provision: Defining a Right to a Remedy*, 47 U. Kan. L. Rev. 655, 675, 677, 679 (1999) (substitute remedy step must require that "the quid pro quo . . . directly benefit those affected rather than simply benefitting the general welfare of society"; if public-welfare benefit satisfies both steps of Section 18

analysis, "the quid pro quo fades into the state's general police power—the legitimate government end becomes the quid pro quo").

Several of our sister states also have recognized that societal benefits cannot satisfy the substitute remedy requirement. See *Smith v. Department of Ins.*, 507 So. 2d 1080, 1087-89 (Fla. 1987) (argument that cap intended to assure affordable, available insurance to all "fails to recognize that we are dealing with a constitutional right which may not be restricted simply because the legislature deems it rational to do so"); *Lucas v. United States*, 757 S.W.2d 687, 690 (Tex. 1988) (societal quid pro quo not valid factor in assessing whether adequate substitute has been provided for restriction on right to remedy; "alleged benefits to society generally," such as lower insurance premiums, lower medical costs for all, do not provide quid pro quo); compare *Wright v. Central Du Page Hosp. Ass'n*, 63 Ill. 2d 313, 328, 347 N.E.2d 736 (1976) (maximum cap on damages violates constitutional provision on special legislation; societal benefits do not provide adequate substitute).

Today's majority, having failed to establish a clear baseline on the necessary direct and individual nature of a substitute for the Section 18 right to remedy, holds that the mandatory minimum primary and excess malpractice insurance coverage provisions of the HCPIAA meet the second part of the quid pro quo test. In the majority's view, because a judgment that cannot be collected is worthless, the mere prospect or availability of some source of recovery provides medical malpractice plaintiffs such as Miller a benefit that other tort victims do not have. I disagree. HCPIAA's insurance requirements do not qualify as a substitute remedy at all, and definitely not an adequate one.

A "remedy" is a judicial means or method for enforcing a right or redressing a wrong. *Neely v. St. Francis Hospital & School of Nursing*, 192 Kan. 716, 720-21, 391 P.2d 155 (1964). As we said in *Noel v. Menninger Foundation*:

"The constitutional provision guaranteeing to every person a remedy by due course of law for injury done him in person or property means that for such wrongs that are recognized by the law of the land the court shall be open and afford a remedy, or that laws shall be enacted giving a certain remedy for all injuries or

wrongs. 'Remedy by due course of law,' so used, means the reparation for injury ordered by a tribunal having jurisdiction in due course of procedure after a fair hearing. It is the primary duty of the courts to safeguard the declaration of right and remedy guaranteed by the constitutional provision insuring a remedy for all injuries.' [Citation omitted.]" *Noel*, 175 Kan. at 762-63.

And Kansans' broad right to remedy under Section 18 includes many aspects of the judicial process. See, *e.g.*, *Lemuz*, 261 Kan. at 946 (abrogation of corporate negligence doctrine preventing plaintiffs from seeking remedy against hospitals for breach of a duty owed under common law implicates Section 18); *Bonin*, 261 Kan. at 214 (statute of repose abrogating minor's right of action for injuries before their discovery implicates Section 18); *Bair*, 248 Kan. at 838 (statute eliminating vicarious liability of health care provider for negligent acts of another when both providers covered by Fund impairs right to remedy under Section 18); *Kansas Malpractice Victims Coalition*, 243 Kan. at 352 (requirement of annuity contract purchase for payment of award for future economic damages violates right to remedy); *Ernest v. Faler*, 237 Kan. 125, 134, 697 P.2d 870 (1985) (notice of claim statute barring right to suit for negligent injuries caused by pesticide application denies remedy in courts to injured person); *Rajala v. Doresky*, 233 Kan. 440, 441, 661 P.2d 1251 (1983) (workers compensation law implicates Section 18 by removing certain common-law remedies for injured employees, including right of action against fellow employees); *Neely*, 192 Kan. at 723 (statute exempting assets of certain charitable institutions from attachment, garnishments, executions, other process for enforcing judgments violates Section 18). Section 18 also covers full reparation for injuries to person, reputation, or property. *Kansas Malpractice Victims Coalition*, 243 Kan. at 349 (all injuries, not just a few) (citing *Neely*, 192 Kan. at 722-23); see also *Manzanares v. Bell*, 214 Kan. 589, 599, 522 P.2d 1291 (1974) (Section 18 includes right to recover noneconomic losses); *Hanson*, 68 Kan. at 677 (same).

Mere access to a source of recovery is not a remedy within the meaning of Section 18. *Kansas Malpractice Victims Coalition*, 243 Kan. at 351. This is a rule of long standing. In 1904's *Hanson v. Krehbiel*, where we held that a statutorily required published re-

traction was not a substitute remedy for the right to recover noneconomic damages for libel, we said:

"The right to a remedy by due course of law is not satisfied by the requirement contained in a statute to make specific reparation for the injury done, which reparation is the same in all cases, and bears no relation to the injury suffered, and has not been decreed by a tribunal after ascertainment of the extent of such injury." 68 Kan. 670, Syl. ¶ 3.

Despite this, the majority asserts that *Bair* and *Lemuz*, as well as workers compensation and no-fault automobile insurance caselaw, support its adequate substitute remedy holding. Again, I am not persuaded by this invocation of precedent.

*Bair* involved a statute that eliminated vicarious liability of one health care provider for the acts of another when both are covered by the Fund. *Bair*, 248 Kan. at 828. Eliminating vicarious liability affected only the right to pursue a secondarily liable party for a single tortfeasor's injury-causing negligence and would come into play only if the tortfeasor employee was financially unable to pay the damages. This context of duplicative insurance coverage essentially made the employer's liability of little consequence; either way, a plaintiff would have only one source of recovery. Even assuming that, in conflict with *Hanson*, a source of recovery could qualify as a remedy, *Bair*'s holding that HCPIAA's mandatory insurance provisions qualified as an adequate substitute remedy was unnecessary, because the statute took no source of recovery away.

*Lemuz* involved a statute that granted medical care facilities immunity from corporate negligence claims. It never actually wrestled with the question of whether access to a source of recovery can qualify as a substitute remedy, because the plaintiff accepted that the mandatory insurance provisions provided such a remedy, arguing only that statutory amendments reducing the amount of primary and excess coverage from unlimited coverage to $3.2 million, as addressed in *Bair*, and then to $300,000 made the remedy inadequate. 261 Kan. at 951-56.

With regard to our workers compensation and no-fault automobile insurance cases, again, both systems provide genuine, wholesale replacement compensation mechanisms in exchange for the loss of the common-law right to remedy involved. See *Man-*

*zanares,* 214 Kan. at 596-99. The workers compensation claimant does not have to prove that his or her work-related injury was caused by the employer's negligence, and an administrative claims procedure has been substituted for the burdens of a traditional personal injury lawsuit. The personal injury protection claimant in a no-fault automobile insurance matter simply submits a claim to the insurance company, rather than filing a lawsuit to prove that a tortfeasor caused the injury. The HCPIAA does not provide a medical malpractice plaintiff such as Miller with anything remotely similar to what the workers compensation and no-fault automobile insurance systems provide. She has been relieved of none of the burdens of traditional litigation of her claim, only of her ability to recover all of her damages. Her route to compensation has been made no more straight, no more level. Today a medical malpractice action must be prosecuted exactly as it was when our Kansas Constitution first guaranteed citizens a right to remedy.

This brings me to the adequacy question. Even if I were to assume that the majority's "available source of recovery" qualified as a substitute remedy less fanciful than *Samsel II*'s floor under judicial remittitur, every individual plaintiff who is successful at trial still runs the risk that the mandatory coverages will be wholly or partially unavailable to pay a judgment because other claims during the policy period have already exhausted them. The shrinking mandatory limits have no doubt exacerbated this problem. The less skilled and careful a provider, the more likely there will be multiple lawsuits, and the more likely any individual plaintiff will get absolutely nothing in exchange for his or her Section 18 right to be made whole. The money will already have gone to those who won the race to the courthouse. Although I am sure that the members of our legislature did not intend to make Kansas a haven for incompetent and/or insolvent providers, the majority's protective approach may mean that the legislature has done exactly that.

Another serious adequacy issue is the inverse proportion between the cap and sinking mandatory insurance minimums on the one hand and the seriousness of a plaintiff's injuries on the other. As long as the cap remains in place, we know with absolute certainty that no plaintiff, no matter how grievously injured, will ever

be finally awarded more than $250,000 in noneconomic damages. It is also therefore beyond question that the most seriously injured plaintiff is likely to be most insufficiently compensated by a system with a K.S.A. 60-19a02 cap. He or she is more likely to be awarded noneconomic damages in excess of $250,000, bringing the cap into play to take away a larger percentage of any larger jury award. In addition, such a malpractice victim also is likely to have the highest economic damages because of greater medical and rehabilitation or life care expenses. The youth of a victim also can increase these damages amounts exponentially. See *Ferdon*, 284 Wis. 2d at 625. The higher these victims' economic damages, the more likely it is that the mandatory insurance coverages will be completely depleted before they see a dime of noneconomic recovery. It is dramatically unfair to place the burden of supporting the state's medical care industry solely upon those most severely injured by a provider. See *Carson v. Maurer*, 120 N.H. 925, 941, 424 A.2d 825 (1980); see also *Brannigan v. Usitalo*, 134 N.H. 50, 57-58, 587 A.2d 1232 (1991) (increase in amount of cap increases unfairness of burden on few most badly injured). The inverse proportion of seriousness of injury/damages to likelihood of recovery inherent in the cap and the mandatory insurance minimums stands in stark contrast to the genuinely adequate substitute remedies the legislature fashioned in the workers compensation and no-fault automobile insurance arenas.

Given the criticisms I have already detailed, I do not address plaintiff's argument that the amount of the cap, even if adequate at the time of its passage, has been driven down to an unconstitutional level of purchasing power by inflation. I note only that the majority provides little cover for the defense position on this point. Indeed, the majority strongly suggests that future legislative refusal to adjust the amount of the cap for inflation endangers today's adequacy ruling.

*Conclusion*

For all of these reasons, I would hold that the legislature has failed to provide any substitute remedy—much less an adequate

one—in exchange for its elimination of plaintiff Miller's right to her award of noneconomic damages greater than $250,000.

One final point bears mention. The majority's use of mandatory medical malpractice insurance and its illusory enhanced source of some recovery as the adequate substitute remedy to satisfy the second part of the quid pro quo test it applies to both Section 5 and Section 18 leaves open the question whether the K.S.A. 60-19a02 cap can survive scrutiny under those provisions when applied to other personal injury plaintiffs. Plaintiff Miller has conceded that she cannot mount a facial challenge to the cap if her as-applied-to-her challenge fails to persuade a majority of this court. See *Cross v. Kansas Dept. of Revenue*, 279 Kan. 501, 507-08, 110 P.3d 438 (2005). This is exactly what has come to pass. Thus the reach of the majority's holding and rationale is limited to the malpractice setting, and our unanimous desertion of *Samsel II*'s only rationale to support upholding the cap in other personal injury cases means it is vulnerable to a renewed attack. This is another reason why I regard the majority's uncomfortable contortions to reach the outcome it reaches here as far too high a price to pay.

## EQUAL PROTECTION

Plaintiff Miller's initial equal protection argument centers on our level of review. She asserts that the fundamental rights at issue mean the legislature's interference with them demands strict scrutiny.

Miller relies on a line of cases in which we describe the right to trial by jury and the right to remedy as fundamental rights. See *Ernest*, 237 Kan. at 132 ("[T]he right of a person injured by the tortious act of another to a remedy for his injuries is one of the basic constitutional rights guaranteed protection by the Kansas courts."); *Gard v. Sherwood Construction Co.*, 194 Kan. 541, 549, 400 P.2d 995 (1965) (right to jury trial "a basic and fundamental feature of American jurisprudence"); *Noel*, 175 Kan. at 763 ("It is the primary duty of the courts to safeguard the declaration of right and remedy guaranteed by the constitutional provision insuring a remedy for all injuries."); *Hasty v. Pierpont*, 146 Kan. 517, 521, 72 P.2d 69 (1937) (quoting *Parsons v. Bedford*, 28 U.S. 433, 446, 7 L.

Ed. 732 [1830]) (by securing right to trial by jury in civil cases in Bill of Rights, framers " 'establish[ed] its importance as a fundamental guarantee of the rights and liberties of the people' ").

I believe Miller's strict scrutiny argument worthy of greater consideration than the majority gives it here, although I reserve ultimate judgment on its merit. We have never provided a reasoned explanation for how and why either of these two significant and fundamental constitutional rights should be subject to only the minimal level of protection afforded by the rational basis test. See Neily, *No Such Thing: Litigating Under the Rational Basis Test*, 1 NYU J. L. & Liberty 898, 909 (2005) (criticizing "yawning chasm" between United States Supreme Court rhetoric referring to occupational freedom as constitutional right, Court holdings that no longer provide any meaningful protection for that right; legislators permitted to trample right "with near total impunity").

Because I would hold that K.S.A. 60-19a02's cap on noneconomic damages violates the right to jury trial and the right to remedy, I do not further pursue this issue today. See Rotunda and Nowak, 4 Treatise on Const. Law - Substance and Procedure, § 18.40 (4th ed. 2008) (if statute violates enumerated constitutional right, generally no need to resort to equal protection analysis; substantive guarantees of constitutional right serve as its strongest protection against limitation).

JOHNSON, J., joins in the foregoing concurring and dissenting opinion.

\* \* \*

JOHNSON, J., concurring in part and dissenting in part: I wholeheartedly join with Justice Beier's concurrence and dissent and fully embrace her well-reasoned legal analysis. I write separately only to share some of my observations about K.S.A. 60-19a02, viewed through the lens of practicality and common-sense, rather than constitutional jurisprudence. For simplicity, I will use the term "doctor" to refer to all medical care providers covered by the statute.

As I understand it, the rationalization for imposing the statutory cap (Cap) on recoverable noneconomic damages in a medical mal-

practice action was to address a perceived crisis created by the nonavailability and high cost of medical malpractice insurance. It would seem abundantly clear that the reason that an insurance company would quit writing policies in Kansas or would raise premiums to an exorbitant level is that the amount of money the company had to pay out in claims was too high in relation to the amount of premiums it had collected from its policyholders, *i.e.*, the insurance company was not making a suitable profit selling medical malpractice insurance in Kansas. Supposedly, then, doctors did not want to practice in Kansas because of the limited availability and high cost of malpractice insurance. So the legislative solution to the doctor shortage (or threat of a doctor shortage) was to establish the Cap, the apparent purpose of which was to fix a limit on the amount of money that a medical malpractice insurer would have to pay on each claim, thereby helping the company make more money and perhaps enticing it to lower its premiums and maybe attract more doctors to this state. Regardless of whether one believes that the "crisis" existed, the legislative "fix" to the stated problem is illogical and counterproductive, as well as making a statement that Kansas citizens do not possess sufficient intelligence, wisdom, and judgment to perform the duties of jurors.

First, I believe it is important to review when a medical malpractice insurer will be called upon to pay a claim under such a policy. Consistent with all liability insurance, a medical malpractice claim is only payable where the doctor is *legally* liable for a patient's injuries. A doctor is legally liable—commits malpractice—only when the doctor fails to exercise an appropriate degree of care and skill. If the doctor has not been careless or medically inept, the doctor has not committed malpractice for insurance purposes, even if the patient suffers a horribly bad result. And who says what degree of care and skill the doctor must satisfy to avoid a malpractice claim? Other doctors practicing in the same field as the defendant doctor set those standards.

In other words, malpractice insurance companies only have to pay for injuries that are caused by an insured doctor's carelessness or ineptitude, as measured by other doctors. I am convinced that Kansas enjoys an abundance of wonderfully skilled, careful, and

professional doctors. But just as we observe in the legal profession, some practitioners are simply incapable or unwilling to consistently perform in compliance with the minimum standards of the profession. One would naturally expect that group of perennially underperforming doctors to be responsible for a disproportionate number of the egregiously injured patients being paid by malpractice insurers.

Perhaps, then, a more effective means of solving a malpractice insurance crisis would be to address its root problem and reduce the number of doctors who are chronically careless and/or unskilled. That is the tack the legislature took when it determined there was a crisis of too many alcohol-related highway deaths. It passed tougher driving under the influence laws to try to get the drunks off of Kansas roads. Why not try to get the unskilled and careless doctors out of their Kansas offices and hospitals?

That course of action would have the added benefit of reducing the *number* of malpractice claims. In contrast, the Cap only addresses the amount of damages to be paid in any *one* claim. A particular doctor could suffer any number of malpractice judgments in any timeframe, thus exposing the malpractice carrier to the possibility of paying multiple $250,000 noneconomic claims. How is that effective to reduce the overall cost of malpracticing doctors?

For a method of achieving an actual solution to the stated crisis, one need only look at how automobile liability insurance carriers operate. Those companies perform an underwriting function each policy renewal to separate the bad risks from good risks, looking at certain factors such as the number of accidents the insured driver has caused. A driver labeled as a bad risk will not be offered a policy at normal rates, but rather will have to pay a substantial premium on a "high-risk" policy for minimum coverage. If that person cannot afford the exorbitant premiums, he or she simply cannot legally drive a vehicle. The very careful driver—one with a long history of driving without an accident—will be rewarded with a preferential policy, providing such things as a good-driver discount or a disappearing deductible. In other words, good drivers do not subsidize the bad drivers' insurance. Likewise, the injured

persons are third-party victims, not parties to the bad drivers' automobile insurance contracts, and they should not have to subsidize the bad drivers' premiums through a reduction in compensation.

In short, if the problem to be solved here really is the availability and cost of medical malpractice insurance, a solution exists that would place the burden on those directly responsible for the problem rather than on their victims. The overall quality of medical care for Kansas citizens would be enhanced because unskilled and careless doctors would be priced out of the malpractice insurance market and unable to practice legally in this State. In contrast, the Cap creates the ultimate irony: Chronically inept and careless doctors are encouraged to locate in Kansas and continue to maim and injure their patients, because those injured patients will help subsidize affordable malpractice premiums through an artificial and arbitrary reduction in collectible damages. Remembering that doctors who exercise the appropriate level of skill and care do not commit malpractice and do not create malpractice insurance crises, one has to wonder whether the legislative goal in fixing the Cap was to increase the availability of doctors who frequently get sued. That is the effect, if not the intent, and I am amazed that the electorate in Kansas is content to let that circumstance continue.

Another concept that I find incomprehensible is the argument that the Cap is needed in order for insurers to have a limit on their exposure. The majority repeats the defense argument that the Cap is needed to "[eliminate] both the difficulty with rate setting due to the unpredictability of noneconomic damages awards and the possibility of large noneconomic damage awards." *Miller*, slip op. at 39. This is a rationalization that must be addressed lest it hoodwink the uninformed. Malpractice insurance policies, like other liability insurance policies, provide for limits of liability. The term "limit of liability" means exactly what it says: a fixed limit on the amount that the insurance company will have to pay in the event of a loss. In other words, the company is protected against an unpredictably high noneconomic jury award by its contract requiring it to pay only the limit of liability for which a premium was charged. That is why the higher the limits of liability on a policy, the higher the insured's premiums. Moreover, "unpredictability" is the touch-

stone of insurance; companies never know when a tornado or hailstorm may hit a particular Kansas town or when an insured driver may cause a 20-car pile-up on Interstate 70. In short, I fail to discern any unique actuarial dilemma for a medical malpractice liability risk. Likewise, as previously noted, the Cap does not provide any stability to the overall exposure of insurers, because it does not prevent multiple, successive claims against a doctor. For instance, a doctor with four malpractice incidents on which the Cap applied could present claims for noneconomic damages totaling a million dollars. How does a Cap make that more predictable?

What I do discern is that the Cap will protect a malpracticing doctor against an excess judgment, over and above the insurance policy limits of liability, which might be collectible against the doctor's personal assets. Perhaps that is a risk to be avoided, but, if so, I would prefer that the Cap proponents be candid about this purpose.

Finally, to state the obvious for us in the legal profession, the amount of noneconomic damages that will compensate a malpractice victim is determined by a jury composed of regular Kansas citizens—not by a "liberal activist judge" or a "greedy plaintiff's attorney." Our friends and neighbors who are doing their civic duty of serving as jurors, and who have no personal interest in the outcome of the case, assess the evidence and fix the amount of damages that are appropriate. Having been called to jury duty myself, I am offended by the legislature's suggestion that Kansas citizens cannot be trusted to determine the appropriate amount of damages on the facts before them. It is at least curious that those legislators who crow about serving in the "people's body of government" would effectively disenfranchise the people they represent by negating their votes as jurors.

Unfortunately, the most affluent and advantaged people in our society often get what they want at the expense of the least fortunate among us whose voice is not loud enough to be heard. Sometimes, juries and the courts will act as life preservers for these burdened minorities. Today, in my view, this court has incorrectly and unnecessarily limited jury involvement and allowed a segment of unfairly burdened Kansans to drown while maintaining higher

profits for insurance companies and lower expenses for doctors. Shame on us.